Lawrence William WRIGHT, Appellant,

v.

Daniel McMANN, as Warden of Clinton State Prison, Appellee.

No. 167, Docket 31023.

United States Court of Appeals Second Circuit.

Argued Nov. 24, 1967.

Decided Dec. 19, 1967.

Lawrence William Wright, appellant, pro se.

Betty D. Friedlander, Waverly, N. Y., for appellant.

John G. Proudfit, Asst. Atty. Gen., of New York (Louis J. Lefkowitz, Atty. Gen., of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen.), for appellee.

Before LUMBARD, Chief Judge, KAUFMAN and FEINBERG, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are called upon to decide whether allegations contained in a complaint filed by a inmate in a state prison, if true, evidence treatment constituting "cruel

and unusual punishment" in violation of the Eighth Amendment of the Constitution of the United States.

Lawrence William Wright, an inmate of Clinton State Prison at Dannemora, New York,[1] appeals from a dismissal of his complaint without a hearing by the District Court for the Northern District of New York, Brennan, J., 257 F.Supp. 739 (N.D.N.Y.1966). The complaint, brought under the Civil Rights Act[2] and seeking an injunction and $10,000 damages for alleged violations of rights secured to Wright by the Constitution of the United States, was dismissed on the grounds that it failed to make a sufficient showing of the denial of Wright's constitutional rights, or, alternatively, that Wright's remedy, if any, lay in the New York courts. We reverse and remand to the District Court.

## I.

The complaint (prepared by appellant without the formal assistance of counsel) alleges[3] that on February 18, 1965, the Deputy Warden, acting on behalf of Warden McMann, the defendant, placed Wright in the solitary confinement unit of the prison for an alleged violation of a prison regulation. The core of Wright's charge seems to be based on the claim that upon reception in solitary confinement, he was placed first in what is known in prison jargon as a "strip cell," where all sorts of cruelties were visited upon him. The conditions to which Wright allegedly was subjected in this cell are best described in his language:

[T]he said solitary confinement cell wherein plaintiff was placed was dirty, filthy and unsanitary, without adequate heat and virtually barren; the toilet and sink were encrusted with slime, dirt and human excremental residue superimposed thereon; plaintiff was without clothing and entirely nude for several days [elsewhere said to be 11 days] until he was given a thin pair of underwear to put on; plaintiff was unable to keep himself clean or perform normal hygienic functions as he was denied the use of soap, towel, toilet paper, tooth brush, comb, and other hygienic implements and utensils therefore; plaintiff was compelled under threat of violence, assault or other increased punishments to remain standing at military attention in front of his cell door each time an officer appeared from 7:30 A.M. to 10:00 P.M. every day, and he was not permitted to sleep during the said hours under the pain and threat of being beaten or otherwise disciplined therefore; the windows in front of his confinement cell were opened wide throughout the evening and night hours of each day during subfreezing temperatures causing plaintiff to be exposed to the cold air and winter weather without clothing or other means of protecting himself or to escape the detrimental effects thereof; and the said solitary confinement cell was used as a means of subjecting plaintiff to oppression, excessively harsh, cruel and inhuman treatment specifically forbidden by the Eighth Amendment to the United States Constitution. (Complaint, ¶ 12.)

In other filed papers Wright states that this "strip cell" was completely barren of furniture with the exception of a sink and toilet. He goes on to state that he was forced to sleep completely nude on the cold rough concrete floor and that the cell was so cold and uncomfortable that it was impossible for him

---

1. Appellant currently is serving an indeterminate sentence of from one day to life, following a 1963 conviction for certain sexual offenses. See People v. Wright, 22 A.D.2d 754, 253 N.Y.S.2d 653 (4th Dept. 1964), affirmed, 16 N.Y.2d 736, 262 N.Y.S.2d 113 (1965), cert. denied sub nom. Wright v. New York, 384 U.S. 972, 86 S.Ct. 1864, 16 L.Ed.2d 683 (1966).

2. This suit is brought under 42 U.S.C. §§ 1981, 1983, 1985(3). Jurisdiction is based on 28 U.S.C. § 1343.

3. Of course, on appeal from the granting of a motion to dismiss, we must accept the allegations in the complaint as true. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

to sleep for more than an hour or two without having to stand and move about in order to keep warm. He adds that food was served to him in bowls placed on the floor of his cell and that he was forced to handle and eat his rations without even the semblance of cleanliness. He describes the cell as fetid and reeking from the stench of the bodily wastes of previous occupants which he says covered the floor, the sink, and the toilet.

Wright was continuously kept in this cell until March 23, 1965—a total of 33 days. A year later, he again was placed in a "strip cell," this time for 21 consecutive days, for violating a prison rule.[4]

## II.

■ Until recently the federal courts refused to review charges instituted under the Civil Rights Act and arising out of state prison disciplinary procedures. The prisoners, instead, were left to pursue whatever remedies were available in the state courts.[5] The oft repeated reasons used to justify this result were (a) that the Eighth Amendment's prohibition against cruel and unusual punishment did not apply to the states, (b) a reluctance to interfere in the internal discipline of state prisons, and (c) the need to utilize state remedies in the first instance. See Redding v. Pate, 220 F.Supp. 124, 126 (N.D.Ill. 1963).

Recent decisions, however, have demonstrated a sharp alteration in the judicial attitude toward these rationales and today the older cases retain little vitality. Indeed, there is no longer any question that a state prisoner may bring an action under the Civil Rights Act. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). Any lingering uncertainty over the applicability of the Eighth Amendment to the States was laid to rest by Robinson v. State of California, 370 U.S. 660, 82 S. Ct. 1417, 8 L.Ed.2d 758 (1962). And, while federal courts are sensitive to the problems created by judicial interference in the internal discipline of state prisons, in appropriate cases they will not hesitate to intervene. Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961); Howard v. Smyth, 365 F.2d 428 (4th Cir.), cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966); Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962); Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965).

■ The harshest blow to the old "hands-off" doctrine was struck by Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). There, in an action under the Civil Rights Act to recover money damages against city police officers for violating rights secured by the Fourteenth Amendment, the Court held that exhaustion of state remedies was not a condition precedent to accepting jurisdiction. Any remaining belief in the vitality of the exhaustion principle was dispelled when the concurrent jurisdiction of the federal courts in cases under the Act was reaffirmed in clear

---

4. What that rule is, we are not told. Wright's *pro se* brief on appeal states that he received no advance notice from the prison authorities of the charges against him, and was not permitted to call witnesses, to confront his accusers, or to speak or defend himself in any manner.

Wright claims also that he was assaulted by various prison guards in the course of being placed in the "strip cell," and that while in the cell he was not permitted to possess his personal Bible and prayer books nor to see the prison chaplain or Episcopal minister. In addition, he states that for several months he was not permitted to attend Sunday

Protestant church services held for the benefit of the inmates. And, according to him, the Warden maliciously placed him in a psychiatric observation cell from April 12 to April 15, 1965, to deter him from making complaints to judicial and other authorities. Lastly, Wright alleges that he was deprived of all his law books and legal materials for a short period of time, and that some of these materials were withheld from him throughout the entire period of his first confinement in the "strip cell," although he was then engaged in appealing his conviction.

5. See cases cited in Pierce v. LaVallee, 293 F.2d 233, 234-235 (2d Cir. 1961).

terms in McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). The Court quoted with approval the language of Judge Murrah in Stapleton v. Mitchell, 60 F.Supp. 51 (D. Kan.1945): "We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum." Id. 373 U.S. at 674, 83 S.Ct. at 1437, n. 6. It is appropriate to note, however, that recently we had occasion to observe that the Supreme Court did not intend *Monroe* and *McNeese* to abrogate the historic principle that federal courts will not entertain a suit in equity when "plain, adequate and complete" remedy may be had at law. Potwora v. Dillon, 386 F.2d 74 (2d Cir. 1967). Of course, *Monroe* settled beyond cavil that exhaustion is not required when only legal relief is sought. And, in any event, in this suit for both legal and equitable relief it is only too clear that New York's remedies are inadequate.[6]

█ Indeed, until relatively recently it was clear that Wright could not even have prosecuted a claim in a New York Court because New York's civil death statute[7] imposed a complete bar to suits by prisoners while incarcerated. See, e. g., Green v. State of New York, 278 N.Y. 15, 14 N.E.2d 833 (1938); Burns v. City of New York, 21 A.D.2d 767, 250 N.Y.S.2d 680 (1st Dept. 1964). Since the amendment of section 6–b of the Correction Law[8] in 1962 McKinney's Consol. Laws, c. 43, a right of action (with leave of a Supreme Court Judge) is afforded for the recovery in the New York Court of Claims of damages resulting from injuries inflicted by an employee or officer of a state prison.[9] But the Court of Claims possesses limited jurisdiction and may award only money damages. New York Constitution, Art. 6, § 9. Section 6–b thus is of no aid to Wright in his quest for an injunction to prevent a recurrence of the brutalities he charges. And money damages are small consolation for a man serving a potentially long sentence and complaining of debasing prison conditions which he endured and fears he might have to endure again.

We are told that the so-called Black Muslim cases[10] suggest another possible remedy in the state courts, for in those cases prisoners succeeded in proceedings under Article 78 of New York's former

---

6. Various descriptions of "adequate" have been given, although in somewhat different contexts: "adequate in theory" and "available in practice," Monroe v. Pape, supra, at 183, 81 S.Ct. 473: "plain, adequate and complete," Potwora v. Dillon, supra; "plain, speedy, and efficient," American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts, proposed 28 U.S.C. § 1371(c) (3) (Tent. Draft No. 4, 1966).

7. Formerly § 510 of the Penal Law; now § 79 of the Civil Rights Law, McKinney's Consol.Laws, c. 6.

8. Section 6–b now provides:
 No civil action shall be brought in any court against the commissioner * * * of correction or an officer or employee of a state prison * * * in his personal capacity, for alleged damages because of any act done or failure to perform any act, while discharging his official duties, without leave of judge of a supreme court, first had and obtained. Any such officer or employee in any such action shall not be liable for damages if he shall have acted in good faith, with reasonable care and upon probable cause.
 Any just claim for damages against such commissioner, officer or employee for which the state would be legally or equitably liable, shall be brought and maintained in the court of claims as a claim against the state.

9. This assumes that § 6–b supersedes *pro tanto* the civil death statute, a matter on which the New York courts have not ruled. Indeed, we are not referred to a single instance in which this section was utilized.

10. Shaw v. McGinnis, 14 N.Y.2d 864, 251 N.Y.S.2d 971, 200 N.E.2d 636 (1964); Brown v. McGinnis, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791 (1962).

Civil Practice Act [11] for mandamus to compel prison authorities to comply with section 610 of the Correction Law guaranteeing religious freedom to prisoners. Thus, the Attorney General argues that since Article 78 proceedings are available to enforce compliance with statutory duties, Wright has an effective remedy. He suggests that Wright should be compelled to bring such a proceeding to enforce section 139 of the Correction Law which forbids prison officials from using unnecessary force. But our answer to this is that an Article 78 proceeding could not provide complete relief because Wright's charges are much broader than a mere claim of unjustifiable assault by a prison official.[12]

We are not unmindful of Art. 1, Sec. 5 of New York's Constitution, which forbids cruel and unusual punishment. But we have not been cited to any case, nor has our independent research disclosed any, in which an inmate has challenged prison conditions under this provision. And, it is not clear that an adequate procedure is available in New York to enforce whatever rights are guaranteed under this provision.[13]

The Attorney General of New York has advised us that he would not oppose upon jurisdictional grounds any relief which Wright might seek in the New York Courts. However, we do not understand the Attorney General's position to be that Wright is clearly afforded an adequate remedy under the cases and statutes that have been cited. In any event, jurisdiction is not conferred by the failure of the Attorney General to object.

Accordingly, it seems to us that the New York Courts would conclude that they lack jurisdiction over Wright's prayer for injunctive relief. And so we have grave doubt as to the existence of a state remedy adequate in either theory or practice. See McNeese v. Board of Education, supra, 373 U.S. at 674–676, 83 S.Ct. 1433.

### III.

We turn now to the abstention doctrine which has been urged upon us and which we believe has little relevance to this case. Cf. Potwora v. Dillon, supra at p. 86 of 386 F.2d n. 5. The principle—which occasionally is confused with the "exhaustion of state remedy" tenet—was first fashioned in an opinion by Mr. Justice Frankfurter, Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and was designed to avoid needless constitutional adjudication. Moreover, if appropriately applied it showed due regard by the federal courts for the sovereignty of the states.

But we cannot ignore that its application gives rise to some sacrifice of the individual's right to federal adjudication, see Note, Federal-Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 604, 605, 606 (1967) (hereinafter Note, Federal-Question Abstention), and the latest pronouncement on the subject by the Supreme Court emphasizes that the doctrine is to be applied "only in narrowly limited 'special circumstances.'" Zwickler v. Koota, 389 U.S. ——, 88 S.Ct. 391, ler v. Koota, 389 U.S. 241, 88 S.Ct. 391, United States v. Livingston, 179 F.Supp. 9, 12–13 (E.D.S.C.1959), affirmed, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960), and quoted with approval in Zwickler v. Koota, supra, 389 U.S. at

---

11. This provision is similar to Article 78 of New York's present Civil Practice Law and Rules.

12. In addition, we have been cited to no case nor have we uncovered any in our research in which a proceeding was brought under Article 78 to force compliance with § 139. This remedy is too nebulous for us to say it is clearly available.

13. What procedure was employed in Brabson v. Wilkins, 45 Misc.2d 286, 256 N.Y.S.2d 693 (Sup.Ct.1965), modified, 25 A.D.2d 610, 267 N.Y.S.2d 580 (4th Dept. 1966), affirmed, 19 N.Y.2d 433, 280 N.Y.S.2d 561, 227 N.E.2d 383 (1967), does not appear from the reports, although a claim of "cruel and inhuman" medical treatment was considered.

p. 244, 88 S.Ct. at 397; Note, Federal-Question Abstention, supra, especially at 604 n. 3.

 While the doctrine has not been entirely abnegated and instances may still arise in which it will be appropriate, see Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959); Railroad Comm'n v. Pullman Co., supra,[14] it is reasonable to conclude that cases involving vital questions of civil rights are the least likely candidates for abstention, e. g., McNeese v. Board of Education, supra, 373 U.S. at 673–674, 83 S.Ct. 1433. See Note, Federal-Question Abstention, supra at 607–608. And, in the instant case "the federal right [is not] in any way entangled in a skein of state law that must be untangled before the federal case can proceed." McNeese v. Board of Education, supra, 373 U.S. at 674, 83 S.Ct. at 1437. Indeed, the objectives of the Civil Rights Act would be defeated if we decided that this federal claim grounded on an alleged violation of the federal constitution would have to stagnate in the federal court until some nebulous or nonexistent remedy was pursued like a will-o'-the-wisp in the state court. See England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

The Task Force Report on Corrections of the President's Commission on Law Enforcement and administration of Justice, cited in our Brother Lumbard's separate concurring opinion, articulates precisely why we are compelled to act in an area so peculiarly within the concern of the states. Recognizing our duty not to require Wright to seek relief in the state courts and not to abstain, we turn to the merits of his Eighth Amendment claim.

### IV.

 Historically, the Eighth Amendment's ban on cruel and unusual punishment was aimed at preventing a recur-rence of torture and barbarous punishments, such as pillorying, disemboweling, decapitation, and drawing and quartering—all too prevalent during the reign of the Stuarts. Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635, 636–637 (1966). By the nineteenth century the provision was believed to be virtually obsolete because the punishments sought to be exterminated had long passed. In 1910, however, the Supreme Court revitalized the prohibition against cruel and unusual punishment. Noting that a "principle, to be vital, must be capable of wider application than the mischief which gave it birth," the Court held that the Eighth Amendment "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." Weems v. United States, 217 U.S. 349, 373, 378, 30 S.Ct. 544, 551, 553, 54 L.Ed. 793 (1910).

We have no hesitancy in holding that the debasing conditions to which Wright claims to have been subjected, and recited in part I of this opinion, would, if established, constitute cruel and unusual punishment in violation of the Eighth Amendment. They offend more than "some fastidious squeamishness or private sentimentalism." Rochin v. People of California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Indeed, the Assistant Attorney General of New York with commendable candor conceded during argument before us that the conditions, if they were as Wright alleged, were "terrible" and "should not be permitted to exist."

While the disciplinary policies of the federal prisons would not necessarily have a bearing, *ipso facto*, in determining whether state prison authorities have so exceeded the bounds of propriety as to have violated the Eighth Amendment, it is of some interest that the directives of the United States Bureau of Prisons

---

14. As we said in Powell v. Workmen's Compensation Bd., 327 F.2d 131, 135–136 (2d Cir. 1964), "these were cases

\* \* \* designed to stay federal injunctive relief pending clarification of state law by its authorized expositors."

on the treatment of prisoners in solitary confinement do not permit the conditions Wright alleges. They require that "the quarters used for segregation shall be well ventilated, adequately lighted, appropriately heated and maintained in a sanitary condition at all times"; an inmate can be deprived of clothing only when prescribed by the Chief Medical Officer for medical or psychiatric reasons; and toilet tissue, tooth brush, comb, etc. are not to be denied a segregated inmate. United States Bureau of Prisons, Policy Statement 7400.5, appendix A, p. 2 (November 28, 1966).

We are of the view that civilized standards of humane decency simply do not permit a man for a substantial period of time to be denuded and exposed to the bitter cold of winter in northern New York State and to· be deprived of the basic elements of hygiene such as soap and toilet paper.[15] The subhuman conditions alleged by Wright to exist in the "strip cell" at Dannemora could only serve to destroy completely the spirit and undermine the sanity of the prisoner. The Eighth Amendment forbids treatment so foul, so inhuman and so violative of basic concepts of decency. Trop v. Dulles, 356 U.S. 86, 100, 101, 78 S.Ct. 590, 597, 598, 2 L.Ed.2d 596 (1958).[16]

## V.

While we recognize that our decision in this case [17] may result in some

---

15. The Warden's answer states that "A strip cell is a necessary part of prison discipline owing to the fact that a prisoner when being punished for breach of prison discipline is placed in solitary confinement or segregation, he often becomes violent and destroys property, tears the cell up, sets fires and otherwise conducts himself as to be dangerous to himself and others. The strip cell is only used to avoid the dangerous consequences of placing a prisoner in a segregated area immediately upon his being sentenced to such punishment." But apparently no determination was made that this *particular* prisoner was or would have become violent. Indeed, the Warden's answer admits that "The treatment of Wright was strictly routine treatment for a violation of prison discipline * * *."

We do not rule out the possibility that in exceptional circumstances it might be necessary to take from a prisoner all objects with which he could harm himself or others. If such circumstances were present in this case, they may, of course, be brought to the attention of the District Court to which this case is being remanded.

16. Conditions in many respects similar to those alleged here were held to violate the Eighth Amendment in Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966). Chief Judge Harris' comments are relevant here: "when * * * the responsible prison authorities in the use of the strip cells have abandoned elemental concepts of decency by permitting conditions to prevail of a shocking and debased nature, then the courts must intervene—and intervene promptly—to restore the primal rules of a civilized community in accord with the mandate of the Constitution of the United States." Id. at 680.

17. What we have said makes it plain that the dismissal of the complaint must be reversed and the case remanded for a hearing. We do not deem it necessary to adjudicate at this time whether Wright was deprived unreasonably of access to the courts or of the opportunity to exercise his religious beliefs. See Sewell v. Pegelow, 291 F.2d 196, 198 (4th Cir. 1961). The answers to these questions depend on finding a proper accommodation between two factors—on the one hand, the wide discretion which must be afforded prison officials in coping with the disciplinary problems they inevitably face, and on the other hand, the increasing judicial recognition that prisoners are not wholly bereft of constitutional rights. See United States ex rel. Yaris v. Shaughnessy, 112 F.Supp. 143, 144 (S.D.N.Y.1953); Note, Constitutional Rights of Prisoners: The Developing Law, 110 U.Pa.L.Rev. 985, 986, 987 (1962). On the mere complaint and answer before us we cannot say whether the deprivations (other than the cruel and unusual punishment claim) to which Wright was subjected were, if true, arbitrary punishments, see Howard v. Smyth, supra, or the result of a proper application of prison discipline.

For example, we can conceive of circumstances that would justify a refusal to permit a particular prisoner to attend a religious service. See United States

increase in the filing of similar complaints in the district courts, we cannot flinch from our clear responsibility to protect rights secured by the Federal Constitution. United States ex rel. Marcial v. Fay, 247 F.2d 662, 669 (2d Cir. 1957), cert. denied, 355 U.S. 915, 78 S. Ct. 342, 2 L.Ed.2d 274 (1958); Hardwick v. Hurley, 289 F.2d 529 (7th Cir. 1961); Sewell v. Pegelow, 291 F.2d 196, 198 (4th Cir. 1961).[18]

The dismissal of the complaint is reversed and the case remanded to the District Court for further proceedings not inconsistent with this opinion.

LUMBARD, Chief Judge (concurring):

I must concur, albeit reluctantly, in the action of the court which requires that the district court hear the charges made in Wright's complaint. The failure of New York to provide a forum whereby the state will listen to complaints of those whom it imprisons leaves us no choice but to open the doors of the federal courts to such prisoners who make claims of cruel and oppressive treatment which, if true, would establish violation of constitutional rights. The reasons why the federal courts must act in an area which is so peculiarly the concern of the states, and for which provisions should be made by them, are well set forth in the Task Force Report on Corrections issued in May 1967 by the President's Commission on Law Enforcement and Administration of Justice. At page 13, the Report states, in regard to safeguards for protection of prisoners against "brutal treatment":

"* * * A fortiori offenders should have recourse against corrupt or brutal treatment and against the deprivation of minimal rights to worship and the like.

"Legal requisites in this area remain almost entirely undefined. Certainly one approach to a sensible reconciliation of interests is through the development of adequate administrative procedures within correctional systems themselves. Hearings involving the offender, review of decisions by persons removed from the immediate situation, explicit policy guidelines and standards, and adequate records to support decisions are examples of lines that should be followed. The adequacy of recourse for grievances against officials should be subject to the oversight of some external authority.

"The continued neglect of this task by corrections may, as it has in the case of police procedures, make it difficult for courts to do anything but write their own rules. The necessity of procedural safeguards should not be viewed as antithetical to the treatment concerns of corrections. The existence of procedures both fair in fact and perceived to be fair by offenders

ex rel. Cleggett v. Pate, 229 F.Supp. 818, 819–821 (N.D.Ill.1964). It may be more difficult to justify depriving a prisoner of a Bible, prayer book and access to the prison chaplain.

We also note that the withholding of all legal materials from Wright for the first few days of confinement in the "strip cell" may be reasonable, Hatfield v. Bailleaux, 290 F.2d 632, 637–638 (9th Cir.), cert. denied, 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961), but withholding for 36 days materials such as the trial record that might be essential for the prosecution of a pending appeal seems dubious. These matters, however, are for the District Judge to determine after a hearing.

18. In order that our holding not be misunderstood or distorted, we hasten to add that we have concerned ourselves only with the facts presented on this appeal; and we do not even suggest that all disputes over prison discipline rise to Eighth Amendment proportions. Certainly, we do not intend to interfere with appropriate state prison discipline nor to suggest that district judges should become referees in prisoner-guard disputes of every nature or description. Cullum v. California Department of Corrections, 267 F.Supp. 524 (N.D.Cal.1967); Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963), cert. denied, 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964); Landman v. Peyton, 370 F.2d 135, 141 (4th Cir. 1966).

is surely consonant with the 'colloborative regime' emphasized as desirable by modern corrections, in which staff and offenders are not cast as opponents but are united in a common effort aimed at rehabilitation. In a prison no less than in society as a whole, respect for and cooperation with authority requires the guaranty of fairness."

It is clear that there is no administrative or judicial body with an unmistakable mandate to entertain an application by Wright for an order that would prevent recurrence of the treatment of which he complains. That the New York Court of Claims with leave of a judge of a supreme court may award damages is not enough. Thus, while all would agree that it is far better that the states should formulate, supervise and enforce their own rules for the treatment of recalcitrant prisoners, we are faced with asking a district court to write some of the rules.

We are not called upon this time to decide whether Wright would be heard upon his constitutional claims in federal court without first applying for statutory relief in a state court if the New York legislature had given to inmates of its prisons the right to apply for injunctive relief against improper treatment. I would hold that if a state made provision for such relief in its courts the federal courts should abstain for a reasonable period to allow the state courts to hear the complaint and take appropriate action. I do not agree that recent decisions of the Supreme Court mandate or were intended to mandate action by federal courts in all cases involving the treatment of prisoners in state institutions, without a suitable period of abstention where state courts are empowered to hear the case and where there is reason to believe that the state would grant relief if the complaint were well founded. The disciplining of state pris-

oners is so peculiarly a matter in the discretion of the state, and the possibilities that prisoners will file groundless and numerous complaints in the federal courts are so obvious, that these cases raise "special circumstances" that make it appropriate to treat them as an exception to the caveat or policy against abstention by federal courts. As it is not certain that New York will entertain a request to enjoin improper correctional treatment and it only affords money damages after the fact, the federal courts have a duty to listen and to act if it be shown that constitutional rights are being disregarded.

In fairness to New York we must make it clear that we do not, by our action, credit Wright's charges; we do no more than say that he must be given an opportunity to prove them. The flood of petitions filed by state prisoners is a constant reminder that the great majority of prisoners are prone to make whatever charge they have reason to believe will get them a hearing, with little or no regard for the truth of their allegations or what they may hope to prove.

But courts are established to hear complaints and to listen to all those which may have substance, however small may be the proportion of those which have merit. There is no doubt that Wright was placed in solitary confinement: the only question is whether the condition of that confinement went beyond those limits which are constitutionally permissible. I agree with Judge Kaufman's conclusion that if the allegations in the complaint are proved, Wright has been subjected to cruel and unusual punishment proscribed by the Eighth Amendment. The Attorney General has advised us that whatever may be the truth as to the condition of solitary confinement in a strip cell in 1965 and 1966, such conditions do not now exist. However, under the circumstances of this case Wright is entitled to a hearing in the district court.