**Ronald NOVAK, individually and on behalf of all others similarly situated,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, et al.**

**Fred A. CRUZ,**

v.

**Dr. George J. BETO et al.**

**Civ. A. Nos. 68-H-348, 69-H-905.**

United States District Court,
S. D. Texas,
Houston Division.

Oct. 15, 1970.

William Bennett Turner, San Francisco, Cal., Frances T. Freeman Jalet, Houston, Tex., for plaintiff.

Crawford Martin, Atty. Gen., Larry Craddock, Asst. Atty. Gen., Austin, Tex., for defendant.

## MEMORANDUM OPINION

SEALS, District Judge.

Petitioners are inmates of the Texas Department of Corrections. In these actions they challenge the constitutionality, under 42 U.S.C. § 1983, of various aspects of the Texas prison system. Plaintiffs Novak and Cruz seek injunctive relief on behalf of themselves and all other inmates of the Texas Department of Corrections against enforcement of respondent's "jailhouse lawyer" rule that prohibits inmate legal assistance on behalf of other inmates. They assert that, inasmuch as respondents do not provide the "reasonable alternative" required by the United States Supreme Court in Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), respondents' prohibition of inmate legal assistance deprives them of their constitutional right of access to the courts free from interference by prison officials. Because of the special circumstances pe-

culiar to Death Row inmates, plaintiff Sellars, a member of that class, seeks on behalf of himself and others so confined, similar relief against the inmate assistance prohibition.

Novak and Cruz in addition challenge the validity of, and pray the court to enjoin, respondent's system of solitary confinement. They contend that the use of solitary confinement, as practiced by respondents violates the eighth amendment's prohibition of cruel and unusual punishments, both as administered and because it is wholly disproportionate to any possible offense committed. Finally, Novak seeks damages in the amount of $10,000 for injuries allegedly sustained as a result of those acts of respondent here challenged. Jurisdiction of this court is properly invoked under 28 U.S.C. § 1343.

## I.

Inmate Legal Assistance—in General

The Supreme Court confronted the problem of inmate legal assistance in Johnson v. Avery, *supra*. The Court held there that, unless the State provides a reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation prohibiting any form of legal assistance by one inmate to another. The Court was dealing with a Tennessee procedure that went no further than the warden's sometimes allowing prisoners to examine the listing of attorneys in the telephone directory, and occasionally contacting the public defender at the request of an inmate. The Court did not specify the minimum standards which a "reasonable alternative" must meet, but it was clear in condemning the Tennessee practice as "far short" of the constitutional requisite. *Id.*, at 489, 89 S.Ct. 747.

The Court's reluctance to structure in precise terms the requirements of inmate legal assistance indicates something more than the Court's common inclination to confine its opinions to narrowly framed issues. There is little doubt that the Court meant to approve a wide variety of legal assistance plans, and to allow each State much freedom in devising a plan that best suits its particular needs and temperament:

> " * * * in several States, the public defender system supplies trained attorneys, paid from public funds, who are available to consult with prisoners regarding their habeas corpus petitions. At least one State employs senior law students to interview and advise inmates in state prisons. Another State has a voluntary program whereby members of the local bar association make periodic visits to the prison to consult with prisoners concerning their cases. We express no judgment concerning these plans, but their existence indicates that techniques are available to provide alternatives if the State elects to prohibit mutual assistance among inmates." *Id.*, at 489–490, 89 S.Ct., at 751.

Far from formulating exact standards, the Court held only that the Tennessee procedure failed to comply with minimum constitutional requirements.

The Fifth Circuit subsequently cast a pale light on the *Johnson* decision. By dictum in Beard v. Alabama Board of Corrections, 413 F.2d 455 (5th Cir. 1969), that tribunal held that a regulation prohibiting inmate legal assistance altogether might be sustained only if the State were to make available a

> "sufficient number of qualified attorneys or other persons capable and willing to render voluntary assistance in the preparation of petitions for habeas corpus." *Id.*, at 457.

It is in the dim light of *Beard* that we must test the validity of the inmate legal assistance program constructed by the Texas Department of Corrections.

The Department provides at each of its units a "writ room," available each week during specified hours and in which an inmate must perform all his legal work. A small "library" is available there and respondents have recently directed that prisoners be allowed to

utilize the law books of fellow inmates as well as those maintained by the State. An extensive legal manual, composed in layman's language, will soon be available in the writ rooms and prison libraries to assist inmates in the preparation of petitions. In addition, prisoners may freely correspond with legal service organizations. Respondents prohibit, however, any other kind of legal assistance among inmates, including one prisoner's advising another or in any way aiding a fellow inmate in preparation of a writ.

But the major step undertaken by the Department to comply with the *Johnson* ruling indicates that Texas is not offering mere token compliance. In September, 1969, the prison system employed an attorney, Mr. Harry Walsh, whose sole responsibility is the provision of legal assistance to inmates. Mr. Walsh testified that another full time attorney is now on the prison staff; that three senior law students were employed at the prison during the summer of 1970; and that law students may soon be available for inmate assistance throughout the year.

Mr. Walsh reported that, in less than a year as the inmate attorney, he has worked with 1371 prisoners. He is authorized even to represent an inmate in a judicial hearing for post-conviction relief and has done so on one occasion. Although he is not permitted to represent inmates in actions against prison officials, he refers complainants to the American Civil Liberties Union.

Mr. Walsh was most impressive in response to questions from the court about how he viewed his role as inmate attorney. He testified that he did not believe it his responsibility to advise prisoners to "take their punishment." Rather, his duty is to furnish legal counsel whenever desired:

"Q. [by the court]: What if you determine a man has no case and he says I want to file it anyway and he has no case?

"A. [by Mr. Walsh]: We will tell him where to file it. We will assist him in completing the forms. We will do all that we can under the circumstances. We will see that it does go to the right people. Of course, we can't make a good case out of a bad one."

Plaintiffs have asserted that one or a few attorneys cannot meet the needs of more than 13,000 inmates. But as respondent correctly points out, not all inmates will wish to take advantage of Mr. Walsh's services, and certainly, not all will want them at the same time. Furthermore, since most courts appoint attorneys to represent indigent habeas corpus petitioners, Mr. Walsh's role is generally limited to giving advice and assisting prisoners in filing complaints.

When this suit was filed, many of those services which respondent now provides were not available to inmates. In view of the State's subsequent efforts to comply with the constitutional mandate, however, we adjudge as moot the question of past failures. There has been no showing that respondents will not continue diligently to conform to the spirit of Johnson v. Avery. Until presented with evidence to the contrary, we cannot assume that any party, especially an agency of the State, will choose deliberately to ignore the United States Constitution.

The record shows clearly that the petitioners in this action seek to protect their asserted right to render legal assistance, not to receive it. Dr. George Beto, Director of the Texas Department of Corrections, explained the probable motivation of the inmates:

"Q. [by the court]: Is there any particular reason why you do not want Fred Cruz assisting other prisoners in the preparation of writs?

"A. [by Dr. Beto]: He could develop an unconscionable control over other inmates by setting himself up as a lawyer. I would like to amplify, your honor. I live in mortal fear of a convict-run prison. Earlier some attention was called to the article in the *New*

*York Times* which described a classic example of a convict-run operation.

"Q. [by the court]: Is that the one in reference to the Kansas penitentiary?

"A. [by Dr. Beto]: Yes, sir. We constantly strive against permitting that to happen. One way in which inmates can develop control of an institution is by aiding other inmates in the writing of writs."

■ It is the "prisoner client's rights, not the jailhouse lawyer's, which are most in need of protection." Johnson v. Avery, supra, 393 U.S. at 501, 89 S.Ct. at 757 (White, J., dissenting). The Constitution confers no right upon the non-lawyer to practice law. And the fact of his incarceration cannot augment this non-existent right. Courts are under no duty to protect

" * * * the assumed prerogatives of those inmates who have, for one reason or another, set themselves up as legal consultants." In re Harrell, 2 Cal.3d 675, at 688, 87 Cal.Rptr. 504, at 512, 470 P.2d 640, at 648. (June 18, 1970)

Finally, we must take note of the great increase in recent years in applications for post-conviction relief as evidence that the Texas "alternative" is "reasonable." State prisoners in 1969 filed 616 petitions in federal district courts in Texas, an increase of 57.6 per cent from 1965. Dr. Beto has testified to the tremendous increase in petitions filed during his regime. And unless we would play the ostrich, we cannot ignore the devastating impact of the habeas corpus applications that have flooded this court in recent years. Since the advent of Mr. Walsh, numerous of these petitions have been typed, and most of them have demonstrated a great increase in comprehensibility. Furthermore, petitioners have failed to cite a single specific instance in which an inmate has been prevented, or even inordinately delayed, in presenting his petition to a court.

■ In his dissenting opinion in Johnson v. Avery, Mr. Justice White suggests that the State be required to provide "reasonably adequate assistance" *Id.*, at 502, 89 S.Ct. 747 without resort to the jailhouse lawyer system. Whatever the merits of this proposal, this court is not required to express an opinion on the desirability of the "reasonable alternative" provided by Texas. We judge only its constitutionality. Within the bounds prescribed by Johnson v. Avery, and amplified upon in Beard v. Albama Board of Corrections, Texas is free to devise its own plan of inmate assistance without the counsel and consent of the federal court. We find that the Texas alternative falls within the required limits.

## II.

### Inmate Legal Assistance—Death Row

■ Because the problem of legal assistance to Death Row inmates was considered by the court in a separate hearing, and because its presents special difficulties, it will be dealt with separately here. Both the State and the plaintiffs agree that the legal needs of Death Row inmates are generally more urgent than those of other prisoners. But many of the same considerations remain valid. For example, Dr. Beto has expressed concern that Death Row inmates with some knowledge of the law, were they allowed to furnish legal assistance, might be able to exercise undue control over their fellows. Furthermore, the same factors which impel our characterization of the general Texas practice as a "reasonable alternative" operate to justify by constitutional standards the Texas preference for legal assistance to Death Row inmates.

Mr. Walsh and his staff are available for counsel with Death Row prisoners and he testified that he has worked with two of them. Dr. Beto has instructed both the Death Row warden and the prison chaplain to insure that these inmates are provided with legal assistance sufficient to enable them to obtain stays of execution. Furthermore, a legal library, identical to that in the writ room, is available for the exclusive use of those incarcerated on Death Row. And unlike

the regular prison population, Death Row inmates may use the law books in their cells.

Texas has considered both the peculiar difficulties of Death Row incarceration and the often compelling need there for swift and certain action. The State has thus allowed Death Row inmates special privileges such as the use of law books in cells, in addition to granting them access to the assistance program devised by Mr. Walsh. It appears to the court that respondents have constructed a "reasonable alternative" for Death Row inmates that is fully in accord with the spirit of Johnson v. Avery.

## III.

### Solitary Confinement

Plaintiffs' second focus of attack is on the practice of solitary confinement as implemented by the Texas Department of Corrections. Plaintiffs assert that conditions in solitary are violative of the eighth amendment's condemnation of cruel and unusual punishments.

At least since Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the prohibition against cruel and unusual punishments has been applicable to the States through the due process clause of the fourteenth amendment. The Supreme Court has not precisely defined the limits of the eighth amendment's proscription. But the Court has suggested that the amendment

> "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

Conditions in solitary in the Texas prison system may be briefly described. The cell is furnished with a combination toilet-wash basin, drinking fountain, and a steel bunk without mattress. Cells are completely dark, but they are kept clean and, except in emergency circumstances, only one inmate is confined to each cell. An inmate in solitary is provided with a cloth gown, a blanket, a toothbrush and toothpaste. He leaves the cell only to take a shower, usually every other day. He is given bread and water daily and one meal every 72 hours. Solitary confinement may continue for 15 days and may be repeated indefinitely after a two-day "break".

Petitioners here brought to the attention of the court numerous recent cases that have dealt with a prisoner's challenge to solitary confinement. In many of them, conditions existing in solitary were far more inhumane than those sanctioned by Texas. In Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966), the California practice was determined to be constitutionally insufficient: Cells were filthy; inmates were deprived of soap, water and toothbrush, and could thus not conform to the most fundamental requisites of personal cleanliness.

In Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969), a prisoner confined in solitary could not flush his own toilet, and was denied the use of soap and toilet paper. In addition, he was compelled to sleep completely nude, and without a blanket, on a bare concrete floor. Again, the court found such conditions to be "cruel and unusual."

The court's principal objection to life in solitary in Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969) was the extreme filth pervading the cells. Toilets could not be flushed from inside the cell, and testimony indicated that the use of dirty mattresses had contributed to the spread of various infectious diseases, including one case of fatal hepatitis.

Likewise, in Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), the court based its conclusion that conditions in solitary violated the eighth amendment largely on findings that inmates were confined nude in such filthy and unsanitary surroundings that their health was seriously endangered.

The recent case of Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y., May 14, 1970) would seem to condemn conditions no more inhumane than those found in the Texas system. Only the length of

confinement—here a full year—was substantially more unreasonable in *Sostre* than in the case at bar. But although we respect the judgment of the New York district court, we cannot defer to the *Sostre* decision. This court must devise its own formula for determining whether the kind of solitary confinement employed by the Texas prison system falls so far short of minimal standards of decency as to merit classification as "cruel and unusual."

We are not here aided by history in discovering an appropriate definition of the eighth amendment's proscription. For although all would agree that crucifixion and torture qualify for the prohibition, we have been reminded that "evolving standards of decency" should be consulted in order to insure that new horrors, unknown to the men of 1787, products of the modern technocratic-authoritarian state, are not permitted stealthily to snuff out the spirit of an eighth amendment decimated by over-literalism.

■ And yet, when this more stringent test is invoked, it becomes clear that the Texas version of solitary confinement cannot qualify for condemnation.

The court is not unaware that certain aspects of the Texas approach are below the standards of some other States— especially with respect to food, lighting and recreation. But, as respondents argue, a four year sentence for a certain offense might be deemed "cruel and unusual" if most penologists generally agree that a two year sentence for that crime is sufficient. Plaintiffs are attacking differences of degree, not of kind, and such differences are necessarily within that realm of administrative discretion within which public officials must be allowed to move freely, lest the judicial stranglehold sabotage the entire system.

Solitary confinement is at present the most severe form of punishment used in Texas prisons. It is reserved for recalcitrant, often incorrigible inmates, and its use is frequently justified by a need to preserve order and to prevent chaos. Dr. Beto, confronted with violent, hardened individuals, who have chosen to abide neither by the laws of the State nor the regulations of the prison, has, at times, no other alternative, save solitary, by which to protect the lives of 13,000 other inmates and to forestall the crumbling of the very foundations of prison society.

Dr. Beto is thus of necessity vested with a great amount of discretion. He is obliged to implement his rules within the bounds prescribed by the Bill of Rights. But within that framework, he must be allowed a degree of latitude sufficient to enable him to experiment with the various techniques known to penology without facing continually the threat of court injunction.

Finally, this court is not competent to prescribe for the Texas Department of Corrections a detailed correctional program, nor are we constitutionally permitted to do so. Rather than define arbitrary requirements that would unnecessarily restrict the possibilities for operation of an enlightened and imaginative penology, we rely on the good faith of Dr. Beto and other prison officials to effect the spirit of the Constitution. The court thus finds that solitary confinement as administered in Texas does not violate the eighth amendment of the United States Constitution.

## IV.

### Damages for Plaintiff Novak

Ronald Novak, one of the plaintiffs in this suit, seeks damages in the amount of $10,000 for injuries he asserts were proximately caused by acts of respondents. Plaintiff Novak alleges that he suffered injuries as a result of physical beatings by prison officials, but he has failed to produce evidence of such beatings. He further charges that his mental illness, diagnosed as schizophrenia by the psychiatric witnesses in this case, was exacerbated by his commitment to solitary confinement. Two of the three medical witnesses refuted this conten-

tion, and the court finds that Novak's charge that his schizophrenia was intensified by his solitary confinement is not supported by the evidence.

Further, Novak alleges that he cut his heel tendon shortly after he was released from solitary, and that this act of self-mutilation was the result of a schizophrenic condition to which respondents had contributed. The court finds that the record furnishes insufficient support for the allegation that Novak's self-mutilation proximately resulted from acts of respondent. We find further that, on the issue of damages, Novak on every count fails to supply the evidence necessary to permit recovery.

## V.

## CONCLUSION

It is clear to the court from the evidence that the Texas Department of Corrections is an outstanding institution in every respect. The court is further convinced that Dr. George J. Beto, Director, is a fair, kind and just man and an excellent administrator. But if the circumstance demands it, as it does frequently, he can be tough without being mean. Dr. Beto has under his supervision and control approximately 14,000 inmates. Most of these have failed themselves and many have failed because the other institutions of Texas, the families, the schools, the church, the law enforcement agencies and the courts have also failed. Dr. Beto and the Texas Department of Corrections receive these failures every day. Many of them are bitter, incorrigible and violent. The Texas Department of Corrections must be given wide latitude, not only to control and try to rehabilitate these unfortunate people, but to protect the inmates who are good candidates for rehabilitation from the influences of the incorrigibles and the potentially violent.

Many of the prisoners are convinced they were wrongfully convicted. Many of them are serving long terms. It takes little imagination to know that these men are difficult to control.

From all the evidence that was presented by the parties to this suit, the court is convinced that not only is the Texas Department of Corrections safeguarding the constitutional rights of its inmates, but also that the system of rewards and punishment practiced by this institution contributes to the early rehabilitation of a large number of its charges.

The Clerk will file this Memorandum Opinion and provide petitioners, their counsel and the Attorney General with true copies.