Nahette Dembitz, J.
The major issue in this proceeding under the Family Court Act is the appropriate and constitutional treatment for a 13-year-old boy who is a long-time school truant and beyond parental control in regard to his school attendance; he was on this ground adjudicated a “person in need of supervision” under sections 712, 732 and 752 of the Family Court Act.[1]
On the basis of the facts detailed below, the court finds that this respondent’s placement in the Warwick State Training School for Boys, as recommended by his probation officer, will promote his welfare and his psychological and social development. Respondent’s attorney argues that the Warwick placement is nevertheless interdicted by Matter of Lloyd (33 A D 2d 385) and Matter of Jeannette P. (34 A D 2d 661), each reversing a training school placement of a “ person in need of supervision ” (generally and hereinafter abbreviated as “PINS ”). Respondent further urges the constitutional point, strenuously debated during and ever since the enactment of the Family Court Act in 1962 but not heretofore adjudicated, that the restraint imposed by training school placement of a PINS — a child who has committed no crime under the Penal Law— violates the gurantees of the Fourteenth Amendment of the United States Constitution of due process and equal protection of law.
The court will first point out the reasons for its conclusions that the Warwick placement promotes respondent’s welfare and is consistent with the Appellate Division opinions cited above — conclusions which compel it to rule upon the constitutional issue. It will then explain its ruling that the application to respondent of the training-school provision of the Family Court *710 Act is constitutional. This court holds that restraint of a parentally uncontrollable school truant by a training school is constitutional if this court reasonably finds that this restraint will benefit the child, even though the child is only self-harming rather than harmful to others and even though analogous conduct on the part of an adult would not constitute a crime nor subject the adult to any restraint.
I. Benefits of Warwick State Training School Placement for Respondent
The issue highlighted by Lloyd and Jeanette P. (cited above) is that training school placement is inappropriate for some PINS children, who need merely removal from their own homes to substitute residences of the type used for children neglected by their parents — generally termed “ open ” facilities. However, considering the conduct and patterns of this respondent, not only is no open facility available for him, but also, placement in the Warwick State Training School appears more desirable.
1. Facts about Respondent.
The uncontroverted facts, briefly summarized, are that efforts by this court and its probation officers over the past 8 months to induce the 13-year-old respondent, a long-time school truant, to resume school, have completely failed. Because of his refusal to attend the public school to which he was assigned, he was accepted in the special individualized day-school maintained by the Office of Probation for truants, and an expert probation officer unsuccessfully attempted to persuade him to try it. While respondent’s hours improved for a few weeks following his first court appearances 7 and 8 months ago, since then he remains out of the house most nights until 2 or 3 a.m. despite admonitions from his mother, apparently ‘£ with older boys ’ ’ but without revealing his whereabouts or activities; he habitually sleeps until 3 or 4 p.m. As to his home circumstances, respondent lives with his mother and siblings in a slum neighborhood on a public assistance budget; he shares a room with an 18-year-old brother who has been out of school and out of work for over a year and is actively homosexual.[2]
*711 An open facility, to which respondent’s probation officer referred him for placement, rejected him on the basis that he required “a more structured setting,” and the Office of Probation reported that “in view of his non-cooperation with the several school plans ” and other factors, applications to other open facilities would likewise prove futile. In the court’s opinion also, mere removal of respondent from his own home to the improved environment of an open facility would not at this juncture of his life motivate him to attend a school in the community regulary (that being a condition of residence in most open facilities) nor to return therefrom to the facility at the required hour.[3]
2. Program of Warwick State Training School.[4]
Warwick State Training School, established “ for the training
and care of children ” (Social Services Law, § 425) and situated on 740 acres of rural land, is a cottage-type institution for hoys from 12% to 15, each cottage housing house-parents and a maximum of 25 boys. The program consists of attendance at a school on the grounds in the morning, with special remedial reading techniques for boys like respondent who read below the third grade level; and vocational training, shop-work, sports, recreation, and counseling for the remainder of the day. The school emphasizes incentives to good performance; and periodic excursions to the local theatre, the Catskill Game Farm, dances with a nearby girls’ institution, etc. are co-ordinated with the incentive program.
The school superintendent holds a degree as a Master of Social Work as also do the School’s Director and Assistant Director of Social Services; a psychologist and six social workers are employed full-time; five additional psychologists a half-day a week; and a psychiatrist part-time daily. Each boy’s cottage assignment and program is determined on the basis of periodic staff conferences as to his educational, social *712 and psychological progress. Visits by parents, during which the parents can confer with the child’s counsellor or social worker, are encouraged; paroles for weekends and for longer periods, such as a two-week Christmas home visit, are customary.
3. Alleged Undesirable Effects of Training School.
While respondent does not criticize the Warwick program, as such, its concomitant effects are attacked. A training-school placement of a PINS, it is argued, means that a child who has not committed any violation of law harmful to others, is placed together with dangerous juvenile delinquents,[5] and thereby learns aggression and criminality. However, in regard to this street-wise respondent this possibility must be compared to his nightly learning on the streets. Further, it obviously is possible for the training school authorities to segregate PINS in a separate school from delinquents (see 'Social Services Law, § 427, subd. 2), or certainly in separate cottages, classes, and groups in a school, if in their educated and expert judgment such separation is beneficial.
Again, the significance in respondent’s life of the stigma which attaches to a training-school returnee must be evaluated in the light of his present poor prognosis as an unschooled, undisciplined street-running teen-ager. Finally, any sense of injustice that a PINS might suffer from placement with delinquents (against whom criminal acts have been proved) would have less basis for a youth like respondent who has repeatedly violated specific mandates as to school attendance and curfew, in a pattern condemned by community standards. As to the recent statement of the White House Conference on Children, as quoted in the press and by respondent’s attorney, that no child under 14 should be placed in a training school, it seems to this court that the chance of the lS^-year-old respondent’s benefiting educationally, psychologically and socially from Warwick would be less if he passed yet more months in his present way of life.
II. Restraints Imposed by Warwick Placement
Warwick’s premises are not walled or fenced, nor are the rooms or buildings locked except for the outer doors at night and except for the Administration Building. The location of the buildings in the midst of farm country some distance *713 from the highway, serves as a deterrent to boys’ eloping; in 1970 out of hundreds of boys at Warwick there were seven elopements. If a boy leaves Warwick without permission or fails to return after a home visit, an arrest warrant can be issued to return him and in one instance in 1970 handcuffs were used for this purpose. It is in these respects that Warwick differs from the open facilities; it is physically easier for a child to elope from the latter, and if he does so he is not forced to return.
As to management of the boys within the school, there is no “strip” or “isolation” room at Warwick like that recently described in connection with a girls’ training school,[6] nor is the procedure there followed of depriving the child of his clothing and of all occupation or recreation ever used at Warwick. For boys who require removal from their regular program, a dormitory is maintained in the Administration Building (that building being locked) in which there are TV, a pool table, and other equipment.
While courts are reluctant to interfere with the internal management of institutions, they cannot refrain from considering whether practices of a State institution unconstitutionally infringe on an inmate’s liberties or invalidate his commitment there. (See Lollis, cited note 6; Wright v. McMann, 387 F. 2d 519; Sostre v. Rockefeller, 312 F. Supp. 863; People ex rel. Ceschini v. Warden, 30 A D 2d 649; People ex rel. Smith v. La Vallee, 29 A D 2d 248, 250; cf. Millard v. Cameron, 373 F. 2d 468, 472-473.) This court must consider the propriety of the use of physical force by training-school authorities against respondent, its only alternative being to refrain from a beneficial placement until specific and adequate regulations are adopted by the Department of Social Services.
Since the sole purpose of respondent’s placement at Warwick is rehabilitation rather than deterrence — no acts presently dangerous to the community having been proved against him— the court views any use of physical force to reinstitutionalize him in the event of his elopement as inappropriate and unreasonable, in part because the need for such force would be indicative of the failure of the rehabilitative program. (The placement order will therefore prohibit the use of such force.) Similarly, forcing respondent to remain in the special unit in *714 the Administration Building for a prolonged period would likewise demonstrate such a failure and the unreasonableness of retaining him at Warwick for the purpose of rehabilitation. (Cf. People ex rel. Ceschini v. Warden, supra; People ex rel. Smith v. La Vallee, supra; Clatterbuck v. Harris, 295 F. Supp. 84, 86.) While the court is reluctant to assume the function of prescribing the maximum period for which school authorities can treat respondent in such unit, in the absence of any regulation establishing a maximum the court will do so in its placement order.
III. Consistency of Placement Order with Appellate Division Decisions
While training school placements for particular PINS children were reversed in Matter of Lloyd (33 A D 2d 385, supra) and in Matter of Jeannette P. (34 A D 2d 661, supra), neither indicates that training school placement is invalid for all PINS. Nor can these decisions be interpreted, as it has been argued, to interdict training school placements whenever parental neglect in a broad sense exists. For, delinquent as well as PINS conduct appears in the great majority of Family Court cases to stem primarily from parental inadequacies in relation to the child, with his economic and social milieu as a secondary factor. And treatment possibilities must be measured in large part by the modes of conduct the child has developed by the time the case comes to court.[7]
The inadequacies of respondent’s mother were passive — an inability to motivate or control him or to maintain a well-kept home[8] — as distinguished from the active rejection or harsh discipline which is manifested by some PINS’ parents and which makes additional coercion of the child by the State seem peculiarly unfair. Nor was respondent’s mother neglectful with respect to the particular issue of trying to secure his school attendance. Indeed, if respondent’s mother had failed in this respect, she, rather than respondent, would be guilty of a violation of the Education Law, and respondent would not be deemed a truant (see Education Law, § 3212, subd. 3). Training school placement, appropriate because of respondent’s tru *715 ancy and the other factors described above, is not rendered either unjnst or inappropriate by his mother’s parenting inadequacies.
IY. Constitutionality of Family Court Act, as Here Applied
1. Definition of “ Person in Need of Supervision.”
While the statutory definition of a PINS as an “ habitual truant ” may lack mathematical precision,[9] there is no violation of due process in its application herein nor in the customary manner of its application by this court. As in the instant case, the established procedure of the Family Court in truancy cases is first to place the child on parole or probation in the community, imposing specific requirements as to regular school attendance (as well as requirements in aid thereof such as a night-time curfew); placement is effected only if such specific conditions are disobeyed. Thus, respondent had adequate notice and warning of specific directions to be obeyed to avoid placement. (Of. Hirabayashi v. United States, 320 U. S. 81, 104-105.) Indeed, under this court’s procedure in truancy cases, imposition of placement is analogous to imprisonment for contempt for violation of an injunction; and here as there, the requirement of specificity adheres to the court order rather than the underlying statute.
As to the discretion to order placement after fact-findings of habitual truancy and of violation of specific orders of parole or probation, the requirements of due process are more. than met, so long as respondent’s counsel has — as he had. here — an opportunity to know and controvert the facts considered by the court, and so long as the placement order is a reasonable rehabilitative measure. (Cf. Williams v. New York, 337 U. 8. 241; People ex rel. Smith v. La Vallee, 29 A D 2d 248, 250, supra.)
2. Constitutionality of Restraint by Training School Placement of Respondent’s Liberty.
*716 Undoubtedly respondent’s placement in Warwick State Training School imposes a restraint on his liberty, for he submits to transportation and residence there due to the threat of State authority. But the argument that respondent has committed no crime or act harmful to others, does not establish that the restraint is unconstitutional. Restraints are constitutionally imposed in many circumstances for rehabilitative and remedial purposes, rather than for punishment. (Robinson v. California, 370 U. S. 660, 665; Matter of James, 22 N Y 2d 545, 551, 553; People ex rel. Ceschini v. Warden, 30 A D 2d 649, supra.) The restraint imposed on respondent is in this court’s opinion constitutional because reasonable rehabilitative measures are justified by respondent’s truancy.
■Compulsory education laws, in effect in New York since 1894, are intended for the welfare of the future adult as well as for the welfare of the State. (People v. Ekerold, 211 N. Y. 386, 391, 393; People v. Turner, 277 App. Div. 317, 319.) It has never been questioned that the State can ‘ ‘ require that all children of proper age attend some school.” (Pierce v. Society of Sisters, 268 U. S. 510, 534; see, also, Meyer v. Nebraska, 262 U. S. 390, 400-402; Zorach v. Clauson, 343 U. S. 306, 324; United States v. Arizona, 400 U. S. 112.) It necessarily follows, and is equally unquestioned, that the State acts constitutionally when it enforces the requirement of school attendance against both parents and children.[10]
Thus, a child who is absent unlawfully is subject to arrest without a warrant for return to his assigned school (Education Law, § 3213), and, if he truants habitually without the acquiescence of his parents, to “ confinement, maintenance and instruction ” in an institution as a school delinquent (.§ 3214). (See Matter of Miller, 12 A D 2d 890; People ex rel. Town of Candor v. Board of Supervisors of County of Tioga, 204 App. Div. 703, 706; De Lease v. Nolan, 185 App. Div. 82.)* [11] The purpose of that provision “ is to compel the ‘ habitual and incorrigible truants ’ to learn — to become educated, not for the good of the individual alone, but for that of the collectivity also.” (Ackley v. Board of Educ. of City of N. Y., 174 App. Div. 44, 47.)
*717 It is true that the State does not exercise control over adults in comparable respects. Thus, doubt has been voiced as to the State’s power to compel able-bodied persons to work in order “ ‘ to remove the temptation to lead a life of crime or become public charges ’ ” (Fewster v. Leary, 20 N Y 2d 309, 315). However, despite the new equation of children with adults with .respect to some rights,[12] the eternal verity of the child’s biological and psychological differences — his immaturity and plasticity— continues to evoke many different legal restrictions as well as privileges for the child.[13] And, while “ the condition of being a boy does not justify a kangaroo court ” (Matter of Gault, 387 U. S. 1, 28), the condition of being a boy does entail dependence' on the part of the child and a reciprocal responsibility on the part of adults.
Adult responsibility, falling initially upon the parent, is recognized in a complex of legal duties, rights, and powers. Thus, the parent has a duty of financial support (Family Ct. Act, art. 4) as well as the right and power to discipline, the Penal Law providing: “ A parent * * * entrusted with the care and supervision of a minor * * * may use physical force * * * upon such minor * * * when and to the extent that he reasonably believes it necessary to maintain discipline or to promote the welfare of such minor” (Penal Law, § 35.10).
While the doctrine of parens patriae does not permit any unfairness in judicial procedure towards juveniles (Matter of Gault, 387 U. S. 1, supra), in this court’s opinion the vitality of that doctrine continues in that the State has the power to perform the parental role of insuring the child’s education and training, when the parent is unable to control him sufficiently to perform it. If children were permitted the same freedom of choice as adults, they might well be unequipped when they attain adulthood to exercise any freedom of choice — specifically, without any education or training, they would be unable to choose to work in a job for which they in fact have the potential. Enforcement against the child of the compulsory school law appears still to be constitutional.
The court concludes, on the basis of the facts stated above *718 as to the respondent and as to the Warwick State Training School for Boys, that his placement there is a reasonable-rehabilitative measure directed towards the education required by the compulsory education law, and that his placement at Warwick is therefore constitutional.
Respondent is placed in the Warwick State Training* School for nine months (the period to be extended if the need be shown), subject to the special conditions as to the use of physical force against him and as to confinement within such school specified in the order of placement. Submission on March 10, 1971, by Warwick State Training 'School of report on respondent’s progress, is requested.

. During the major portion of this proceeding, a person in need of supervision was defined as a male under 16 or female under 18 who is “ an habitual truant or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of parent, or other lawful authority.” (Family Ct. Act, § 712, prior to an amdt., ef£. Sept. 1, 1970).

. A report from the “ Children and Youth Comprehensive Medical Care Program of Roosevelt Hospital,” stating it had been treating respondent’s family for several years, strongly recommended his placement because “he is running the streets.” The court psychiatrist also recommended respondent’s placement, “in a treatment oriented facility,” without specifying the type of treatment; there is no indication in the body of the report that psychiatric treatment or individual psychotherapy would be appropriate or beneficial.
All reports considered by the court are disclosed to respondent’s attorney, pursuant to section 746 of the Family Court Act.

. When the probability of a child’s success in an open facility is low, his placement there may be positively detrimental. Thus, PINS eases are frequently terminated without the child’s improvement or a training school placement, because by the time the child’s placement on probation and in an open facility have both been tried and failed, he is no longer at an age or stage of development when a training school might benefit him.

. Since it is unfeasible to take prolonged testimony from training school representatives in every case in which a training school placement is contemplated, the statements in the text are based on such testimony in another proceeding, published reports of the Department of Social Services, information directly from Warwick, and on progress reports received from Warwick as to other placed children, which reveal its program and approach.

. A delinquent is a person under the age of 16 who commits “ any act which, if done by an adult, would constitute a crime ”. (Family Ct. Act, § 731.)

. See Lollis v. New York Slate Department of Social Services (70 CIV. 4750 S.D. [N. V.]), decided December 18, 1970, describing such a room but noting that the record established “ that isolation is never invoked at five of the twelve training schools and rarely at two others.”

. See Allen, The Borderland of the Criminal Law, 32 Social Science Rev. 107, 117.

. A neglect petition filed at the court’s direction against respondent’s mother by her public assistance worker, was withdrawn because she was already willingly — ■ without coercion — participating in counseling and supportive services (at Roosevelt Hospital), co-operating in all proposals to aid her children, and showing improvement.

. The Court of Appeals has indicated that habitual truancy can refer to anything more than “ a single act of truancy ” (People v. Pikunas, 260 N. Y. 72, 74). And under the amendment of section 712 of the Family Court Act, effective Sept. 1, 1970, substituting the phrase “ who does not attend school, in accord with the provisions of part one of article sixty-five of the education law” for the phrase “who is an habitual truant,” any unexcused absence apparently would be sufficient to constitute the child a PINS (see Education Law, §§ 3205, 3210). However, in practice this court applies a much more lenient standard.

. As to the parent, see Education Law, §§ 3212, 3233; People v. Donner (278 App. Div. 705, affd. 302 N. Y. 857, app. dsmd. 342 U. S. 884).

. The Family Court has jurisdiction over proceedings against an habitual truant by virtue of section 3232 of the Education Law, as well as the Family Court Act provision respecting PINS. For similar laws in other States, see, e.g. West Morris Regional Bd. of Educ. v. Sills (110 N. J. Super. 234); Matter of Pigg v. State (253 N. E. 2d 266 [Ind., I960]).

. Matter of Gault (387 U. S. 1); see Wyman v. James (400 U. S. 309).

. E.g., a child under a certain age is not subject to criminal jurisdiction (Penal Law, § 30.00), can avoid certain of his contracts (General Obligations Law, § 3-101), is especially protected in regard to sexual activity and danger from adults (Penal Law, art. 260), cannot work in certain occupations (Labor Law, § 133), cannot marry (Domestic Relations Law, § 15-a), and can be restricted in his reading matter (see Butler v. Michigan, 352 U. S. 380).