UNITED STATES of America ex rel.
William L. BRACEY, Jr.

v.

Alfred RUNDLE, Superintendent State Correctional Institution at Graterford, Pennsylvania.

Civ. A. No. 70-393.

United States District Court,
E. D. Pennsylvania.

Nov. 29, 1973.

Ronald Soskin, Legal Intern, Philadelphia, Pa., for plaintiff.

Israel Packel, Atty. Gen., Harrisburg, Pa., Michael Minkin, Asst. Atty. Gen., Dante Mattioni, Deputy Atty. Gen., Eastern Regional Director, Philadelphia, Pa., for defendant.

OPINION

JOSEPH S. LORD, III, Chief Judge.

In this lawsuit, brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, plaintiff alleges that during his incarceration in the State Correctional Institution at Graterford, Pennsylvania, he was twice placed in segregation cells under conditions amounting to cruel and unusual punishment and without first being afforded the minimal elements of

procedural due process.[1] He seeks damages for these claimed deprivations of his Eighth and Fourteenth Amendment rights. A nonjury trial was held at which plaintiff was ably represented by student counsel appointed pursuant to Local Rule 9½.

*Due Process Contentions*

The alleged denials of procedural due process occurred in connection with plaintiff's placement in the maximum-security cell block immediately upon his arrival at Graterford on February 8, 1969 and his transfer on December 31, 1969 from the general population at Graterford to punitive segregation. The facts of each transfer follow.

On February 7, 1969, plaintiff was convicted after a full trial in the Court of Common Pleas of Cumberland County of assault and conspiracy charges stemming from his participation in a prison disturbance at the State Correctional Institution at Camp Hill, during which he assaulted a prison guard. On February 8, he was transferred from Camp Hill to Graterford and was immediately placed in Graterford's maximum-security cell block, where he remained until March 12. The record is unclear on plaintiff's status while in the maximum-security cell block. It appears, however, that he was in administrative segregation during this period, although for reasons not fully elucidated at trial he spent much of his time confined to a cell normally used for punitive segregation.[2] The prison records indicate that plaintiff was "interviewed" at least three times between February 10 and March 12 by the Behavior Clinic, a body composed of prison officials which normally conducts prison disciplinary hearings. Plaintiff denies that he was ever interviewed. For reasons discussed below, we need not resolve this dispute.

The second transfer of which plaintiff complains is his placement in punitive segregation from December 31, 1969 to February 3, 1970. In late December there was a work stoppage and hunger strike at Graterford in which, according to plaintiff's own estimate, approximately 800 inmates participated and which apparently was serious enough to require the presence of Pennsylvania state troopers. Prison officials believed that plaintiff had conspired with a number of other inmates to organize and enforce the hunger strike and work stoppage. On December 31, plaintiff was removed from his cell by a prison guard and state troopers, handcuffed, and taken to a punitive segregation cell. Three days later he and other alleged strike ringleaders, handcuffed together in groups of three, were brought before Deputy Superintendent Wolfe and the other prison officials who comprised the Behavior Clinic. Wolfe asked each if he was a leader of the strike. Plaintiff denied that he was a leader but admitted that he was one of the many inmates who were participating in the strike, saying that his participation was a means of pressing the authorities for improved educational and vocational training programs and better food services. Wolfe then told the plaintiff he understood that he had threatened other inmates to coerce them to join the strike. Plaintiff asked Wolfe what proof he had to support this allegation, to which Wolfe responded by waving before him a sheet of paper on which, apparently in fulfillment of an assignment for a remedial writing course, plaintiff had written an essay discussing ways in which the prison's programs could be improved.[3] Plaintiff was then told that he would be sent back to punitive segregation pending further investigation. He testified that he heard nothing more until he was re-

---

1. Plaintiff was released from Graterford before this case was tried and is no longer an inmate.

2. The confusion arises from the fact that the maximum-security cell block at Graterford houses prisoners in administrative segregation as well as those in punitive segregation. Nine cells customarily house punitive segregation inmates; the rest are normally used for those in administrative segregation.

3. This essay, which was last in defendant's control, has apparently vanished.

turned to the general population on February 3.[4]

In Gray v. Creamer, 465 F.2d 179 (C.A.3, 1972), the Third Circuit held that "the transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing does not, absent unusual circumstances not evident in the [Gray] pleadings, meet minimal due process requirements." 465 F.2d at 185. United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (C.A.3, 1973), reaffirmed the teachings of Gray, saying in dicta that a transfer to punitive segregation must "be based, after a hearing, on 'facts rationally determined.'" 471 F.2d at 1203. In its most recent explication of Gray, the court of appeals has held that due process is present

> "when facts are rationally determined in a proceeding where the prisoner (1) is notified of the accusation and informed of the evidence against him, and (2) is afforded a reasonable opportunity to explain his actions. Sostre v. McGinnis, 442 F.2d 178, 198–199 (2d Cir. 1971), cert. denied sub nom. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972)." Braxton v. Carlson, 483 F.2d 933 (C.A. 3, 1973).

Plaintiff argues that the procedures followed in connection with his two placements in solitary confinement denied him the minimal due process required by Gray. It is now clear that Gray, as interpreted in Braxton, requires far less than plaintiff says it does.[5]

But whatever may be the precise form of hearing required by Gray, we must decide at the outset whether Gray's teachings may be applied at all to this case, thereby deciding whether defendant is liable for damages for his failure to meet Gray's standards more than two years before the case was decided.

Before Gray, there had been no Third Circuit decision requiring prison officials to afford a prisoner notice of the charges against him or a hearing before placement in solitary confinement. Gray and Tyrrell, as the court of appeals has since pointed out, "followed courses previously uncharted in this circuit." United States ex rel. Arzonica v. Scheipe, 474 F.2d 720, 722 (C.A.3, 1973). There had been only one pre-Gray district court decision in this circuit requiring that the traditional benchmarks of due process be observed before a prisoner's transfer to punitive segregation, United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (E.D.Pa.1972), but that case was decided one week before Gray and thus also more than two years after the confinements at issue here. The state of the law in 1969 and early 1970 on the due process questions plaintiff raises was tabula rasa at most.

█ The threshold question to be decided here is therefore whether a prison warden may be held liable for damages for following procedures which may fall short of the standards set out in later cases but which at the time of the acts complained of were not in conflict with any binding decided cases.

---

4. This is plaintiff's version of the confrontation. Since we found plaintiff an extremely credible witness and defendant has introduced not a shred of evidence to contradict him, we accept plaintiff's recollection.

5. Plaintiff argued in his trial memorandum that to satisfy the mandates of the Due Process clause, pre-transfer procedures must include the following elements, all of which he claims were denied him in connection with one or both of his placements in segregation: written notice of the charges, a hearing before an impartial tribunal, the right of the prisoner to call and cross-examine witnesses, counsel

or counsel substitute, and notification of a verdict based on the evidence presented at the hearing. In Braxton, supra, the court concluded that it is not essential that inmates be afforded "written notice of the charges, representation by counsel or a lay substitute, confrontation and cross-examination of adverse witnesses, presentation of favorable witnesses, and a written report of the [disciplinary body's] conclusions." 483 F.2d 933 at 941. It should be noted that the trial was had and all pleadings filed in this case well before Braxton was decided.

In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967),[6] the Supreme Court held that a police officer is not liable for § 1983 damage claims flowing from arrests made pursuant to a statute later held unconstitutional, if at the time of the arrest he "reasonably believed [the statute] to be valid." 386 U.S. at 555, 87 S.Ct. 1213, 18 L.Ed.2d 288.

"We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983. . . . We agree that a police officer is not charged with predicting the future course of constitutional law." 386 U.S. at 557, 87 S.Ct. at 1219.

This case, along with other prisoners' Civil Rights actions brought after the recent landmark decisions expanding inmates' due process rights before the institution of disciplinary action, raises the question of whether prison wardens acting in reasonable reliance on the validity of procedures not yet held unconstitutional are, unlike police officers, "charged with predicting the future of constitutional law." The short answer, reached here by us and in every reported decision that we have found, is that they are not.

In Clarke v. Cady, 358 F.Supp. 1156 (W.D.Wis.1973), a prisoner sought monetary damages under § 1983 for the defendant warden's failure to give him a hearing before placing him in punitive segregation. At the time of the transfer to solitary, there was no decisional law binding on the warden holding that a prior hearing was constitutionally required. The court concluded that the principles of Pierson v. Ray were controlling on the question of the warden's liability for damages, saying:

"I can perceive no persuasive legal basis for holding that a police officer may rely upon his reasonable belief that a criminal statute is constitutional, prior to a final binding adjudication of its constitutionality, but that a warden of a prison may not rely upon his reasonable belief that certain prison policies are constitutional, prior to a final binding adjudication of their constitutionality." 358 F.Supp. at 1161.

The court held therefore that a prison warden may assert as a defense in a § 1983 action for damages his reasonable reliance on the validity of prison policies which at the time did not contravene any controlling decided law.

A similar result was recently reached by the Fourth Circuit, which reversed a district court's holding that a prison warden's good faith reliance on the validity of prison procedures before placement of inmates in solitary, apparently later held unconstitutional, could not be raised by the warden as a defense in a prisoners' suit for compensatory damages brought under § 1983. Skinner v. Spellman, 480 F.2d 539 (C.A.4, 1973) (per curiam). The court of appeals held that such a defense was available and therefore that if the warden "was acting in a reasonable good faith reliance on what was standard operating procedure in the Virginia prisons, he should not have to respond personally in damages." 480 F.2d at 540.

The Seventh Circuit is apparently also of the opinion that Pierson v. Ray governs this situation. In Adams v. Carlson, 488 F.2d 619 (C.A.7, filed Aug. 23, 1973), they decided that their decision giving inmates procedural safeguards before placement in solitary was to be ap-

6. The late Judge Body of this court, in a case quite similar to ours, treated this issue as a retroactivity question, holding that Gray is to be applied retroactively in actions for equitable relief but prospectively only in actions for damages. Although we reach the same result as to a prison official's liability for damages and are in agreement with much of Judge Body's thoughtful and extensive opinion, we do not think this strictly a question of retrospective application and thus approach the problem slightly differently via Pierson v. Ray, supra.

plied retroactively in a § 1983 suit for injunctive relief attacking a confinement in solitary before that decision was handed down which did not follow the procedures mandated after the fact of the prisoners' placement in punitive segregation. Although the court did not have a claim for monetary damages before it, it noted:

> "In its present posture, this case is unlike a suit for damages under a Civil Rights statute, where the constitutionality of official conduct is measured by the state of promulgated decisional law at the time of the acts in question. Pierson v. Ray [supra]; Gaito v. Strauss, 249 F.Supp. 923 (W.D.Pa.), aff'd on other grounds, 368 F.2d 787 (3d Cir. 1966); Bowens v. Knazze, 237 F.Supp. 826 (N.D.Ill. 1965)."
> At 629.

Any other position is inconceivable. To hold that a reasonable good faith reliance on the state of the law at the time of the acts complained of here is not a defense would be to require prison officials to be seers of developing doctrine in a particularly difficult and uncertain area of the law. Prison officials should not be liable for damages simply because they are not blessed with the gift of constitutional clairvoyance. We therefore hold that a reasonable reliance on the validity of the procedures used here renders defendant immune to plaintiff's damage claims.

We are aware that this conclusion creates what may seem a slightly anomalous result. It means that a prisoner who was denied notice or a hearing, or who was denied a hearing meeting the minimal standards of *Gray*, may collect damages from the responsible prison officials if the denial occurred after *Gray* was decided, while his counterpart whose denial of minimal due process occurred before *Gray* may not. But unless we choose to require as a condition of service as a prison warden the ability to predict with accuracy the future development of the law, this anomaly is unavoidable.

Assuming that defendant may in principle assert good faith reliance as a defense, we must decide whether there was good faith reliance here. "Good faith" in this context does not connote a subjective absence of malice or ill will. We agree with the conclusion of Clarke v. Cady, *supra*, that it signifies instead a reasonable reliance on existing procedures and a reasonable belief in their validity at the time. There was no testimony at the trial precisely on this point. We think, however, the absence at the time of these two confinements of any authority which would have suggested to defendant and his subordinates that they could not have acted as they did, provides a sufficient basis for a finding that the reliance on the presumed validity of the procedures followed here was reasonable. It would be an empty exercise to require further testimony on this point.

*Eighth Amendment Contentions*

We now turn to plaintiff's allegation that the conditions of his two confinements constituted cruel and unusual punishment prohibited by the Eighth Amendment. He alleges essentially identical conditions in the cells in which he stayed during both confinements. Plaintiff was confined to cells which were furnished with a porcelain toilet, a sink, and a metal bed frame attached to the wall. The mattresses were removed during the daylight hours.[7] Light came into the cells through windows across the corridor and from artificial light in the corridor. Although there was conflict in the testimony concerning the heating conditions in the cells, we find that the cells were not well heated and at times the temperature was low enough to create condensation on the windows and possibly on the walls. Plaintiff was clothed in standard prison garb, changed once a week, and was given three blankets. He was permitted to shower

---

7. This regulation has since been changed. Bureau of Correction, Administrative Directive No. 1 (Revised Februry 14, 1968 and Amended August 6, 1969), March 15, 1971 revision. (Plaintiff's Exhibit #5).

once a week and was supplied with adequate materials for personal hygiene and for cleaning his cell. He was permitted to exercise regularly during his first confinement and was not allowed to exercise at all during his stay in punitive segregation.

██ The strictures of the Eighth Amendment are not static. Their scope changes as society changes. "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Solitary confinement is not *per se* cruel and unusual punishment, Sostre v. McGinnis, 442 F.2d 178, 192 (C.A.2, 1971), nor are all harsh penalties or severe conditions of confinement forbidden by the Eighth Amendment. *See* Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The punishment proscribed by the Eighth Amendment has been variously defined as conditions which are "so foul, so inhuman, and so violative of basic concepts of decency," Wright v. McMann, 387 F.2d 519 (C.A.2, 1967); punishment which is "barbarous" or "shocking to the conscience", Church v. Hegstrom, 416 F.2d 449, 451 (C.A.2, 1969); and "physical and mental abuse or corporal punishment of such base, inhumane, and barbaric proportions so as to shock a court's sensibilities * * *", Burns v. Swenson, 430 F.2d 771 (C.A.8, 1970). *See also* Lareau v. Mac Dougall, 473 F.2d 974 (C.A.2, 1972); Sostre v. McGinnis, *supra*.

██ These are not standards which can be applied to any given complaint with mathematical precision. However, we hold that while the conditions under which plaintiff spent his time in maximum security and punitive segregation were undoubtedly severe, they did not rise (or fall) to the level of cruel and unusual punishment. Such conditions as the deprivation of bedding during the day, the low temperatures in the cells, and the lack of exercise during plaintiff's second confinement might all, in different degrees and under a different totality of circumstances, be indicative of punishment in violation of the Eighth Amendment. *See* Landman v. Royster, 333 F.Supp. 621, 648–649 (E.D.Va. 1971); Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969); Wright v. McMann, *supra*. Here, however, we find nothing to suggest that the circumstances under which plaintiff was confined went beyond severity and harshness and into the realm of the Eighth Amendment.

The foregoing shall constitute the findings of fact and conclusions of law required by F.R.Civ.P. 52.