**Richard O. J. MAYBERRY, Plaintiff,**

**v.**

**William B. ROBINSON et al., Defendants.**

**Civ. No. 76–415.**

United States District Court, M. D. Pennsylvania.

Feb. 22, 1977.

Richard O. J. Mayberry, pro se.

Francis R. Filipi, Asst. Atty. Gen., Bureau of Corrections, Camp Hill, Pa., for defendants.

OPINION

MUIR, District Judge.

1. Introduction

The Plaintiff, Richard O. J. Mayberry, presently an inmate at the State Correctional Institution at Dallas, Pennsylvania, filed a complaint pursuant to 42 U.S.C. § 1983 on April 2, 1976 alleging violation of his constitutional rights by the Defendants William B. Robinson, Commissioner of Correction [sic] of the Commonwealth of Pennsylvania, Glen R. Jeffes, Superintendent of the State Correctional Institution at Dallas, Joseph M. Ryan, Deputy Superintendent at that institution, Albert J. Perlis, Mail Inspector Supervisor at the institution, Lieutenant John M. Kerestes, and a Sergeant Lavan. The jury was drawn on December 6, 1976. The trial commenced December 28, 1976 and, except for two days spent in drawing juries for the January session and pre-trial conferences for that session, continued through January 24, 1977.

In addition to damages, the Plaintiff requested injunctive relief and the purpose of these findings of fact, discussion, and conclusions of law, is to set down in writing matters pertinent to the injunctive relief requested.

Mayberry's voluminous complaint covers 17 distinct issues. Starting on the second day of the trial, the Court daily informed Mr. Mayberry and counsel for the Defendants that the case was not being presented in a concise manner and that the Court would not allow the trial to occupy an inordinate amount of time. At the beginning of the trial day on Thursday, January 13, 1977, the Court again advised Mr. Mayberry and counsel for the Defendants that the case was not proceeding with the expedition which was required and that the work of the Court with respect to other cases awaiting trial was being impeded. The Court then directed that the presentation of evidence on liability would terminate at the close of business on Friday, January 21, 1977, which termination took place. Reasons for imposing this time limitation are set forth hereafter in the discussion portion of this document.

98 special verdict questions were presented to the jury. Of all the issues submitted to the jury, a finding of liability in favor of Mr. Mayberry was made with respect to only one issue, interference by Albert J. Perlis, the Mail Inspector Supervisor, with mail of the Plaintiff directed to the District Attorney of Luzerne County, Pennsylvania, and the Deputy Court Administrator of the Court of Common Pleas of that county. On Monday, January 24, 1977, the issue of damages on this question was submitted to the jury which returned a finding of nominal damages in the Plaintiff's favor in the amount of $100.00. For reasons set forth hereafter the Court will reduce the nominal damages to $1.00.

The Court makes the following findings of fact:

2. Findings of Fact

2.1 Restriction on Visits and Correspondence with James and Priscilla Mayberry

1. Richard O. J. Mayberry pleaded guilty in the Court of Common Pleas of Chester County, Pennsylvania, to criminal

attempt (Murder), aggravated assault, assault by prisoner, possessing instruments of crime, and attempted escape on charges arising out of a shooting by Mayberry of one of the guards who were transporting Mayberry from the United States District Court for the Eastern District of Pennsylvania, where he was engaged in litigating a civil rights action, to Graterford Prison for his overnight stay on January 21, 1974.

2. Although Mayberry pleaded guilty to the above charges, he testified at the trial of this case, *Mayberry v. Robinson*, Civil No. 76–415, that the guards attacked him with guns while transporting him from Court and that he has instituted suit against the guards for invasion of his constitutional rights by reason of the incident.

3. The Defendant Jeffes, Superintendent of the State Correctional Institution at Dallas, was advised by Pennsylvania State Police that the gun used by Mayberry in the shooting of the guard January 21, 1974 had been traced to a dealer who identified a picture of James Mayberry, brother of Richard O. J. Mayberry, Plaintiff herein, as that of the individual who had bought the gun from him.

4. Jeffes was advised that Harry Somner, the guard shot by Mayberry, was seriously injured.

5. Jeffes was advised by his subordinate that a handcuff key had been found in Mayberry's cell in the Behavior Adjustment Unit (B.A.U.) at Dallas and this key was introduced into evidence in the current case as Defendant's Exhibit 64 on January 3, 1977.

6. The handcuff key mentioned above was etched as if by body acids, indicating that the key had been swallowed.

7. Despite the warning of the Court to defense counsel that the introduction of the key in evidence was considered by the Court to be undesirable and that a photograph should be substituted therefor, the key was offered in evidence on January 3, 1977.

8. Sometime during the trial the handcuff key was ripped from the Exhibit tag attached to it and was stolen.

9. The exhibits during the trial were available for examination from time to time by Mr. Mayberry, by defense counsel, by court personnel, and possibly by others whose identity is unknown.

10. Jeffes and Ryan were informed by their subordinates that Mayberry attempted to electrocute a fellow prisoner by placing electrified bars on a magazine laid on the grillwork of his cell and requesting that the intended victim take the bars to another place. The intended victim picked up the magazine with the bars rather than picking up the bars themselves, whereupon the bars rolled together, short circuited, and blew the pertinent fuse at the prison.

11. Jeffes was informed by his subordinates and the state police that Mayberry had had in his possession a T-bone from a steak which was sharp and lethal. Mayberry was charged with possessing instruments of escape and two other crimes as a result of an altercation between Mayberry and another prisoner in which Mayberry was armed with the T-bone and the other prisoner armed with a homemade knife. Mayberry was convicted on two of the charges. A new trial was awarded by the Court of Common Pleas of Luzerne County with respect to the charges as to which Mayberry was convicted. On January 5, 1977, Judge Dalessandro of the Court of Common Pleas of Luzerne County ordered the dismissal of the charges. The state police and the district attorney determined that these charges should be nolle prossed.

12. At a preliminary hearing at the prison, Mayberry attempted to stab another inmate with a Bic pen. The stabbing was avoided because the pen struck the handcuffs of the intended victim. At the time of the attack, Mayberry was able to release one of his hands from his handcuffs.

13. Mayberry has been the subject of more than 50 misconduct reports in the last four years while in the B.A.U. at Dallas.

14. Mayberry addressed mail to attorney David Rudovsky at the home address of James Mayberry and Priscilla Mayberry,

2711 East Thompson Street, Philadelphia, Pennsylvania.

15. Mail was addressed to Mayberry, showing the return name and street number as David Rudovsky, 2711 East Thompson Street, Philadelphia, Pa. which is the residence of James and Priscilla Mayberry. The envelopes were endorsed "Privileged Correspondence Legal Mail".

16. The Defendant Jeffes called to the attention of James and Priscilla Mayberry in a letter dated May 2, 1975, the possible violation of the mailing regulations arising out of the use of their address as the address of David Rudovsky and suspended their rights to correspond to and with Mayberry until a reasonable explanation was furnished the Superintendent with respect to these items. No explanation has ever been given by James and Priscilla Mayberry to Jeffes of these matters. (Defendants' Exhibit No. 7).

17. Jean Mayberry, mother of Richard O. J. Mayberry, is permitted to visit the Plaintiff freely.

18. Other persons are permitted to visit the Plaintiff so long as their names appear on Mayberry's visiting list and they present no reasonable threat to the institution's security.

19. A report submitted to then Superintendent Leonard J. Mack stated that in November, 1972, Mayberry's cell was searched and the following items discovered: hacksaw blades, matches, protectively coated road map, a weapon with a taped handle, a piece of carborundum wire, and requests for asylum in many different languages. Also, it was reported to the Superintendent that several of the bars in Mayberry's cell had been sawn through and the separation camouflaged.

20. In 1966 the Plaintiff was convicted of perjury.

### 2.2 Restriction on Correspondence with Martha Austria

21. Jeffes was advised that letters were being sent by Mayberry through Martha Austria to her brother, Dominick Codispoti, an inmate in another state prison in Pennsylvania.

22. Mail regulations prohibit correspondence between prisoners in different institutions in the Pennsylvania correctional system without prior approval.

23. Jeffes on August 4, 1975 requested an explanation from Martha Austria of her apparent use as a go-between for correspondence between Mayberry and Codispoti and suspended the Plaintiff's right to correspond with Martha Austria until a reasonable explanation had been received from her.

24. Jeffes has never received a reply from Martha Austria.

### 2.3 Restrictions on Circulation of the "Prisoner's Free Press"

25. The Plaintiff Mayberry is the publisher of the Prisoner's Free Press.

26. Then State Commissioner of Correction Stewart Werner banned the circulation of the "Prisoners' Free Press" in all penal institutions in the Commonwealth of Pennsylvania and his order is still in effect.

27. Circulation of the "Prisoners' Free Press" is not permitted at the State Correctional Institution at Dallas in accordance with an order of Defendant Jeffes.

### 2.4 Interference with Correspondence with Attorney David Kairys at Post Office Box 4731

28. Box No. 4731, Philadelphia, Pa., is a post office box rented by the Imprisoned Citizens Union of which Richard O. J. Mayberry and James Mayberry are officers.

29. James Mayberry has access to Box No. 4731.

30. Mail was sent by Mayberry addressed to David Kairys, Attorney at Law, Box No. 4731, Philadelphia, Pa. On March 8, 1974, two envelopes addressed to Mayberry and containing the typed name and return address of Mr. David Kairys, Attorney at Law, P.O. Box 4731, Philadelphia, Pa., 19134, were opened by prison officials in Mayberry's presence. One envelope contained a letter from an inmate at the Unit-

ed States Federal Penitentiary at Leavenworth, Kansas. The other envelope had a letter from an inmate at the California State Prison at San Quentin, California.

31. On March 11, 1974, Defendant Jeffes prohibited Mayberry from corresponding with Attorney David Kairys through the use of Post Office Box No. 4731, Philadelphia, Pa.

32. Mayberry was not prevented from corresponding with Attorney Kairys at his office address, 1428 Walnut Street, Philadelphia, Pennsylvania.

33. Subsequent to the date of Jeffes' Order of March 11, 1974, Richard O. J. Mayberry has received mail from the law firm of Rudovsky and Kairys in which their printed envelopes were used and their full address shown.

2.5 Restriction on Incoming Legal and Business Mail

34. There is no evidence that there has been a failure to deliver to Mayberry any of his incoming legal mail.

35. Mayberry ordered books and magazines on a pay later basis.

36. Several prisoners at the State Correctional Institution at Dallas have ordered a substantial number of books and magazines for which they have never paid.

37. Inmates at the state institution at Dallas have defrauded book and magazine publishers of a substantial sum of money.

38. On July 1, 1976, Jeffes issued an order notifying all prisoners at the State Correctional Institution at Dallas that all publications which were not prepaid would be transmitted to the inmate addressee only if his address as shown on the publication included his correct name, his prison number, and the words State Correctional Institution, Dallas, Pennsylvania.

39. All publications which have not been paid for and which are addressed in accordance with the above directive of the Defendant Jeffes are delivered forthwith to the inmate addressee.

40. All publications received at the State Correctional Institution at Dallas which do not comply with the directive mentioned above are returned to the sender endorsed with a stamp showing that the addressee is a prisoner at the State Correctional Institution at Dallas, Pennsylvania and the inmate is informed of this.

41. Mayberry receives multiple copies of each issue of several magazines.

42. At one time Mayberry was receiving seven copies of each issue of Oui Magazine.

43. Jeffes then notified Oui Magazine that Mayberry was an inmate at the State Correctional Institution at Dallas and Oui Magazine terminated the subscriptions.

44. Mayberry has received at the State Correctional Institution at Dallas publications addressed to him as follows:

Richard J. Mayberry,
SCI Drawer K
Dallas, Pa. 18612
KH–2727 Dallas

R. Oliver Mayberry
Box K H–2727
Dallas, Pa.

Mr. J. Mayberry, Esq. Box 56
IMP Cit Union Richard Mayberry
Dwrk H2727 Dallas, Pa.

R. Oliver Mayberry Md
Drawer K H–2

2.6 Confiscation of U.S. Air Force Survival Manual

45. On June 21, 1974, Mayberry's cell was searched after he had left the prison on what became a six-month absence in connection with a legal action.

46. During the search, a United States Air Force Survival Manual bearing a cover of the United States Supreme Court Rules was confiscated as contraband.

47. The cost of such a United States Air Force Survival Manual is $4.25.

48. The whereabouts of the survival manual is presently unknown by the Defendants and it may well have been destroyed.

49. The State Correctional Institution at Dallas is in a rural, wooded area.

50. The Manual describes how to survive in the wilderness.

### 2.7 Solitary Confinement and Conditions Thereof as Cruel and Unusual Punishment

51. Mayberry has been confined in solitary confinement in the B.A.U. and its annex at Dallas since November, 1972, except for periods of as much as six months when Mayberry has been absent from the prison in connection with litigation.

52. Mayberry is a high escape risk.

53. Mayberry is a danger to the physical well-being of other prisoners and to prison personnel.

54. The food at the B.A.U. is of like quality and quantity to that served to inmates in the general population at the State Correctional Institution at Dallas.

55. The menu at the State Correctional Institution at Dallas is on a five week cycle prepared according to nutritional standards and is certainly more than adequate in variety and quantity.

56. Prisoners in the B.A.U. are entitled to one hour per day of exercise which includes five to seven minutes for a shower.

57. Foreign matter in Mayberry's food has been either infrequent or non-existent.

58. Dallas is not a walled institution.

59. Plaintiff's cell in the B.A.U. is furnished with a heated cement area for a bed, a toilet, a drinking fountain, and a lavatory with hot and cold water.

60. The cells in the B.A.U. and its annex are adequately illuminated and ventilated.

61. Daily medical care by a doctor is available to each inmate in the B.A.U. who reports an illness.

62. Chaplain service on a regular basis is provided to all inmates in the B.A.U.

63. The cells in the B.A.U. are approximately the same size as the cells throughout the Dallas institution.

64. Every inmate in the B.A.U. is given a weekly review of his incarceration in the B.A.U. by the Program Review Committee and a monthly review which he is entitled to attend if he elects to do so.

65. Mayberry often refuses to attend the monthly review of his incarceration in the B.A.U.

66. Jeffes has advised Mayberry that he will not be considered for transfer from the B.A.U. unless six months without a valid misconduct report elapse and he passes an appropriate psychiatric or psychological examination which would indicate that it is safe to place him in the general population.

67. When visitors are not allowed to see Mayberry, he is provided with an explanation by prison authorities.

### 2.8 Purpose of litigation

68. Mayberry's primary purposes in this litigation are to impede the judicial system and harass state prison officials and not to vindicate his constitutional rights.

69. Mayberry's complaint is nine pages in length and contains 41 paragraphs.

70. If this case had been tried non-jury the Court would have found against Mayberry and in favor of Perlis on the issue of obstruction of Mayberry's two letters to the District Attorney and Deputy Court Administrator of Luzerne County because the amount of the delay could not have exceeded two working days.

71. The Plaintiff admitted ordering books for the witness Holzer to be delivered to the latter, not prepaid, and sending in the order blanks by improper use of legal mail addressed to Mayberry's attorney.

72. During the last eight trial days of the trial, Mayberry spent 11 hours and 51 minutes interrogating witnesses or making opening or closing statements and counsel for the Defendants spent twelve hours and 55 minutes in like activity.

## 3. Discussion

Richard O. J. Mayberry's many claims for injunctive relief will be dealt with *seriatim*.

I. Correspondence and Visitation with James and Priscilla Mayberry

Mayberry seeks an order allowing him to correspond and visit with his brother and sister-in-law, James and Priscilla Mayberry. Prison officials at the State Correctional Institution at Dallas have prevented Mayberry from corresponding and visiting with these two persons because they are of the view that such acts present a serious threat to the security of the prison, to the guards, to other inmates, and increase substantially the possibility of Richard Mayberry's escape. Mayberry does constitute a serious security problem to prison officials. As set forth in the findings of fact he has shot a guard and has seriously assaulted other inmates. In addition, on separate occasions a handcuff key and hacksaw blades have been found in his cell. Over fifty misconduct reports have been filed against him in the last four years while he has been in the Behavior Adjustment Unit (B.A.U.) at Dallas. There is evidence to indicate that James Mayberry may have supplied Richard with the gun he used in his January 21, 1974 escape attempt in which he shot a guard. This incident occurred when state guards were transporting Mayberry from the U.S. District Court in Philadelphia, where he was involved in civil rights litigation, to the State Correctional Institution at Graterford to spend the night.

Richard O. J. Mayberry violated prison regulations when he addressed mail to Attorney David Rudovsky at the home address of James and Priscilla Mayberry. Conversely, mail was addressed to Mayberry showing the typed return name and street number of Attorney David Rudovsky, 2711 East Thompson Street, Philadelphia, Pa., which is the residence of James and Priscilla Mayberry. The envelopes were stamped "Privileged Correspondence Legal Mail". In a letter dated May 2, 1975, Glen R. Jeffes, the Superintendent of the State Correctional Institution at Dallas, called to the attention of James and Priscilla Mayberry the possible violation of the mailing regulations arising out of the use of their address as the address of Attorney David Rudovsky and suspended their rights to correspond to and with Mayberry until a reasonable explanation was furnished the Superintendent with respect thereto. James and Priscilla Mayberry have never given any explanation of these matters to Jeffes.

Interference by prison officials with the First Amendment rights of inmates to write to and receive letters from friends and relatives is permissible only when it furthers a substantial governmental interest such as security, order, or rehabilitation, and is no greater than necessary to achieve these goals. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The ban on communication in this case is in substantial furtherance of the security of the prison, its inmates, its guards, and of the prevention of escape. The curtailment of Mayberry's First Amendment interests and those of his brother and sister-in-law are no greater than necessary to accomplish these ends. Consequently, Mayberry's request for injunctive relief with respect to correspondence with James and Priscilla Mayberry will be denied.

The standards which must be met before an inmate's visitation privileges can be limited are less clear. Some courts have concluded that visitation privileges are a matter subject to the discretion of prison officials. *McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir. 1975), *Feazell v. Augusta County Jail,* 401 F.Supp. 405 (W.D.Va. 1975); *Henry v. State of Delaware,* 368 F.Supp. 286 (D.Del.1973). Other courts appear to have applied the *Procunier* test to visitation. *United States ex rel. Wolfish v. Levi,* 406 F.Supp. 1243, 1247 (S.D.N.Y.1976). Even after being placed in the maximum security environment of the B.A.U., Mayberry was able to obtain a handcuff key and a lethal weapon made from a steak bone. Allowing such a dangerous individual to visit with a brother who, according to the state police, probably supplied him with a gun which he used to shoot a guard on his way to Graterford from a federal courtroom, where he was a civil rights Plaintiff, presents a great security risk to prison

guards, other inmates, and the public. The chances of escape are greatly increased. In addition both James and Priscilla Mayberry have violated the mail regulations of the institution and have refused to offer any explanation. For the above reasons even if the requirements of *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) govern visitation, the action of prison officials in this case has met these standards. The ban on visits between Mayberry and his brother and sister-in-law also fails to constitute an abuse of discretion. See *Patterson v. Walters*, 363 F.Supp. 486 (W.D. Pa.1973). In the light of the foregoing, Mayberry's claim for injunctive relief with respect to visits of James and Priscilla Mayberry will be denied.

II. Correspondence with Martha Austria

Mayberry maintains that the order issued by Superintendent Jeffes on August 4, 1975 prohibiting him from corresponding with Martha Austria violates his constitutional rights. After Jeffes was informed that Mayberry was sending letters to Dominick Codispoti, an inmate in another state prison in Pennsylvania, through his sister, Martha Austria, Jeffes has prevented Mayberry from communicating with Martha Austria until she provides a reasonable explanation for such alleged conduct. Jeffes has not received any reply from Martha Austria. Bureau of Correction mail regulations prohibit communication between inmates in different institutions without the prior approval of prison officials.

Interference with correspondence must meet the requirements of *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed. 224 (1974). The Court concludes that it does in this case. The prohibition of communication between prisoners by means of a third party furthers the substantial governmental interest of security. Such correspondence could be used to convey information that would aid an escape or circumvention of prison regulations. Suspension of contact pending an explanation of the alleged violation of the mail guidelines by Martha Austria constitutes a limited and permissible intrusion into Mayberry's and Martha Austria's First Amendment rights which is no broader than necessary to further the security interests of the institution. Consequently, Mayberry's contention that this prohibition should be terminated will be denied.

III. Prisoner Free Press

Mayberry argues that prison officials prevented him from obtaining the Prisoner Free Press Newsletter, although other inmates at Dallas were allowed to acquire it freely. Then Commissioner of the Bureau of Correction Stewart Werner issued a statewide order, which is still in effect, banning inmates in the Pennsylvania Correctional System from receiving the Prisoner Free Press Newsletter. Mayberry does not challenge the validity of the order prohibiting prisoners from obtaining the Prisoners Free Press Newsletter. Since the issue has not been raised, the Court is in no way indicating whether that statewide order is valid. Jeffes and his subordinates at Dallas do not allow any prisoner to receive that newsletter. Consequently, Mayberry's request for injunctive relief based upon his claim that he alone of all prisoners at Dallas is deprived of the publication will be denied.

IV. Communication with Attorney Kairys

Mayberry challenges the constitutionality of the order promulgated by Superintendent Jeffes, preventing him from communicating with Attorney David Kairys at Post Office Box 4731 in Philadelphia. That box is rented by the Imprisoned Citizens Union of which Richard O. J. Mayberry and James Mayberry are officers. Mayberry sent mail addressed to David Kairys, Attorney at Law, Box 4731, Philadelphia, Pennsylvania. On March 8, 1974, two envelopes addressed to Mayberry bearing the typed name and return address of "Mr. David Kairys, Attorney at Law, Post Office Box 4731, Philadelphia, Pa., 19134", were opened by prison officials in Mayberry's presence. One envelope contained a letter from an inmate at the United States Federal Penitentiary, Leavenworth, Kansas, and

the other a letter from an inmate at the California State Prison, San Quentin, California. Because of this violation of prison regulations, on March 11, 1974 Jeffes prohibited Mayberry from corresponding with Attorney David Kairys through the use of Post Office Box No. 4731, Philadelphia, Pennsylvania. There is no evidence to indicate that Kairys uses that box for any purpose. Mayberry was not and is not prevented from corresponding with Attorney Kairys at the latter's office address, 1428 Walnut Street, Philadelphia, Pennsylvania. At trial, Mayberry presented no reason why he could not communicate with Kairys at his office address. The order of March 11, 1974 in no way interferes with or impedes Mayberry's access to counsel. In addition, it meets the requirements of *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), in that it furthers the substantial interest of prison security and is an intrusion which is no greater than necessary to accomplish the advancement of that goal. In the light of the foregoing, Mayberry's claim for injunctive relief as to corresponding with Attorney Kairys through the use of Post Office Box 4731 in Philadelphia will be denied.

V. Incoming Legal & Business Mail

Mayberry contends that prison officials at Dallas are unconstitutionally restricting his incoming legal and business mail. After hearing evidence for several days on this point, this Court concluded that delivery of Mayberry's incoming legal mail has not been substantially delayed. Jeffes in his capacity as Superintendent has issued a regulation concerning incoming publications which state that those which were not prepaid would be transmitted to the inmate only if his address shown on the publication included his correct name, his prison number, and the words "State Correctional Institution, Dallas, Pennsylvania." The reason for this was that several prisoners at the institution had ordered a substantial number of books and magazines for which they never paid. This regulation is applied to all prisoners at Dallas equally. All publications received at the State Institution at Dallas which do not comply with this order are returned to the sender, endorsed with a stamp showing that the addressee is a prisoner at the State Correctional Institution at Dallas, Pennsylvania.

Mayberry has received at the State Correctional Institution at Dallas publications containing several variations of his address, none of which give any indication that he is an inmate. He has also received publications which have "Esq." and "Md." after his name. The right of an inmate to receive publications is protected by the First Amendment of the United States Constitution. *Morgan v. LaVallee*, 526 F.2d 221 (2d Cir. 1975); *The Luparar v. Stoneman*, 382 F.Supp. 495, 499 (D.Vt.1974); *McCleary v. Kelly*, 376 F.Supp. 1186 (M.D. Pa.1974). Thus, the standards set forth in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) must be met. The regulation in question advances the substantial governmental interest of rehabilitation and order in the prison. Prison officials should not be forced to stand by helplessly while inmates engage in potentially fraudulent and illegal practices. Prison officials must have the authority to promulgate reasonable procedures to prevent these actions. It is in the rehabilitative interest of an inmate to prevent him from committing further infractions of society's criminal code. The interference with Mayberry's First Amendment rights is no broader than necessary to accomplish this purpose.

Similar regulations have been held to be constitutional. In *Mower v. Swyhart*, 545 F.2d 103 (10th Cir. 1976), the Tenth Circuit Court of Appeals stated that a federal prison's refusal to allow an inmate to receive a correspondence course catalog through the mail without prior approval and authorization of the Supervisor of Education of the Bureau of Prisons did not violate his constitutional rights. In *Woods v. Daggett*, 541 F.2d 237 (10th Cir. 1976), the Court upheld the validity of a regulation forbidding inmates from receiving books except from a publisher. In the light of the foregoing,

Mayberry's claim for injunctive relief as to this cause of action will be dismissed.

VI. Air Force Survival Manual

Mayberry requests that the Court issue an order requiring prison officials to return Mayberry's "United States Air Force Survival Manual" to him. The Manual, which cost $4.25, was seized on June 21, 1974 from Mayberry's cell after he left the prison for a period of six months in connection with a legal action. Mayberry's copy of the Survival Manual bore the cover of the United States Supreme Court Rules when it was confiscated as contraband. Prison officials contend that the Survival Manual is a threat to the security of the institution because it describes in detail how an individual can live off the land. The Dallas Correctional Institution is in a wooded and somewhat remote area. Hacksaw blades, matches, a weapon with a taped handle, a piece of carborundum, and requests for asylum in many different languages were found in Mayberry's cell in November, 1972. In addition, Mayberry attempted to escape from custody in 1974. Prison officials feel that the Survival Manual may aid Mayberry in any future escape. Because the Manual relates to the physical security of the institution the Court is willing to give more credence to the views and expertise of prison officials than it would if the manual related to political, sociological, or philosophical ideas. Confiscation of the manual advances the substantial governmental interest of security. In addition, the seizure is no greater an intrusion upon Mayberry's First Amendment rights than is necessary to effectuate that purpose. The Defendants do not know where the Survival Manual is. It may well have been destroyed. Consequently, Mayberry's claim for relief as to the United States Air Force Survival Manual will be denied.

VII. Cruel and Unusual Punishment

Mayberry contends that his confinement in the Behavioral Adjustment Unit (B.A.U.) at the State Correctional Institution at Dallas is cruel and unusual punishment both because of the conditions of confinement and because of the length of his stay in it. Mayberry does not argue that the original decision to place him in the B.A.U. was in violation of the Due Process Clause of the Fourteenth Amendment. In fact, he makes no due process contention whatsoever. Mayberry was placed in the B.A.U. because he was and remains a security threat to the institution and the community. As stated above, even while in the B.A.U., over 50 disciplinary reports have been filed against him. In addition, as stated previously, on several occasions contraband has been found in his cell. Although an inmate may be placed in the B.A.U. when security interests justify it, prison officials must insure that his continuation in that confinement is required by his present conduct. *Kelly v. Brewer*, 525 F.2d 394 (8th Cir. 1975); *Ford v. Jeffes*, Civil No. 75–575, (M.D.Pa. November 17, 1976.) Mayberry's case is reviewed every week by the Program Review Committee and once a month Mayberry himself is given the opportunity to appear in person before the Committee to argue for his release from the B.A.U. On several occasions he has refused to exercise this option. The Court concludes that Mayberry's confinement in the B.A.U. is related to his threat to the security and safety of the institution, its guards, and other inmates. *Tyree v. Fitzpatrick*, 325 F.Supp. 554 (D.Mass.1971) aff'd 445 F.2d 627 (1st Cir. 1971); *Royal v. Clark*, 447 F.2d 501 (5th Cir. 1971); *Breece v. Swenson*, 332 F.Supp. 837 (W.D.Mo.1971). It is not punitive. Mayberry has been informed by prison officials, including Superintendent Jeffes, that he will be considered for release from the B.A.U. when for a six month period he does not violate any prison regulations and submits to psychological testing which results in a finding that it is safe to place him in the general prison population. Because Mayberry's confinement in the B.A.U. is based upon his ongoing conduct, the length of his residence in that Unit does not constitute cruel and unusual punishment.

The Court also concludes that the conditions of confinement in the B.A.U.

do not rise to the level of cruel and unusual punishment. In *Ford v. Jeffes,* Civil No. 75–575 (M.D.Pa. November 17, 1976), Judge Herman and a jury examined the same B.A.U. unit at Dallas and concluded that placement there does not constitute cruel and unusual punishment. Cruel and unusual punishment has been held to be conduct that is foul, inhuman, and violative of basic concepts of decency, *Wright v. McMann,* 387 F.2d 519 (2d Cir. 1967), punishment which is barbaric and shocking to the conscience, *Church v. Hegstrom,* 416 F.2d 449, 451 (2d Cir. 1969), or physical or mental abuse or corporal punishment of such base, inhuman, and barbarous proportions as to shock the Court's sensibilities. See *United States ex rel. Bracey v. Rundle,* 368 F.Supp. 1186 (E.D.Pa.1973); *Watkins v. Johnson,* 375 F.Supp. 1005 (E.D.Pa.1974), aff'd 511 F.2d 1397 (3d Cir. 1975). This Court in *Jordan v. Arnold,* 408 F.Supp. 869, 876 (M.D.Pa.1976) adopted the approach set forth in *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir. 1967) where the Court stated that the civilized standards of human decency did not permit a man to be left nude in a cold cell for substantial periods and deprived of basic elements of hygiene such as soap and toilet paper. *Wright* held that such conditions violate basic concepts of decency. That test was also used by this Court in *Brown v. Mazurkiewicz,* Civil No. 73–697 (M.D.Pa. 10/25/74) and was held to encompass the elimination of unsanitary and correctable conditions even where they are something less than barbaric. The conditions of confinement in the B.A.U. at Dallas are not barbaric and are sanitary. Inmates at the B.A.U. at Dallas are allowed one hour of exercise per day. In *Jordan v. Arnold, supra,* this Court found that two exercise periods of one hour each per week were adequate. In addition, the inmates in the B.A.U. at Dallas are permitted to shower daily. Mayberry's cell in the B.A.U. is furnished with a heated cement area for a bed, a toilet, a drinking fountain, and a lavatory with hot and cold water. The cells in the B.A.U. and its annex are adequately illuminated and ventilated. Daily medical care by a doctor is available to each inmate in the B.A.U. who reports an illness. Chaplain service is also provided. The cells in the B.A.U. are approximately the same size as the cells throughout the Dallas institution. The food served the prisoners in the B.A.U. is of like quality and quantity to that served to inmates in the general population at Dallas. The menu is prepared according to nutritional standards and is more than adequate in variety and amount. Mayberry contends that foreign matter appears in his food. The Court concludes that this allegation is without basis. Mayberry is not subjected to mental abuse or corporal punishment nor is he deprived of basic implements of personal hygiene, medical care, or the opportunity for exercise. *Crowe v. Leeke,* 540 F.2d 740 (4th Cir. 1976). Consequently, Mayberry's request for injunctive relief as to the condition and length of confinement will be denied.

VIII. Denial of Visitation Rights

Mayberry contends that he is subjected to cruel and unusual punishment because he has been denied visitors. With the exception of James and Priscilla Mayberry, Richard Mayberry is allowed visitors on the same basis as other inmates. In addition, if an individual is not allowed to see Mayberry, prison officials provide Mayberry with a reasonable explanation for the denial. *Thomas v. Brierley,* 481 F.2d 660 (3d Cir. 1973). In the light of the foregoing, Mayberry's request for injunctive relief as to this claim will be denied.

IX. Transfer of Holzer

Mayberry requests that this Court issue an order prohibiting him or Holzer, an inmate at the State Correctional Institution, Camp Hill, Pennsylvania, from being transferred from Dallas during pendency of this action; and allowing him and Holzer to engage in oral or written communication related to the conduct of this suit; and requiring Robinson, the Commissioner of the Bureau of Correction to allow Holzer to correspond with and receive visits from Holzer's brother; and requiring Robinson and Jeffes to place Holzer in the Dallas

institution until released by the Courts; to return Holzer to Dallas if he has already been transferred; and requiring Robinson and Jeffes to provide for the personal safety and well being of Holzer and protect him from assault or injury. This request will be denied. Holzer asked to be allowed to withdraw as a Plaintiff in this suit and the Court granted that request. In addition, Mayberry was permitted to confer with Holzer at the United States Courthouse during the course of this trial because Holzer was a witness for Mayberry. The Court will not enter an order transferring Holzer because he has no constitutional right to be in any particular state institution. The other requests for orders relating to Holzer will also be denied since he has no case before this Court. It appears to the Court that Mayberry is attempting to force the joinder of Holzer's claims with Mayberry's either to allow alleged "legal correspondence" between the two in violation of prison policy or to complicate further an already complex case just for the exercise.

X. Other Claims

Mayberry's remaining claims for relief will be denied in accordance with this Court's Order of January 13, 1977. That Order stated that the liability phase of this case would close at the conclusion of Court on January 21, 1977. The Court entered the Order because it felt that Mayberry's presentation of his case indicated that his primary purpose was to delay and impede the functioning of this Court. Starting on the second day of this trial, the Court daily informed Mayberry that time was of the essence and that he would not be given an unlimited opportunity to litigate his claims but only such time as was reasonably necessary and essential. Although Mayberry is not an attorney, he exceeds many lawyers in his understanding of the Rules of Evidence and Procedure and of the United States Constitution. Mayberry was one of the first prisoners in Pennsylvania to utilize 42 U.S.C. § 1983 and the Court concludes that his knowledge of that statute surpasses that of the average attorney.

The Court entered the Order limiting Mayberry's time in which to present his claims after lesser measures had failed. Warnings had no effect. The Court consistently attempted to prevent repetitious witnesses and testimony. Mayberry always replied to inquiries by the Court that the testimony was not repetitious and was not irrelevant and that this would become apparent later. Mayberry also often changed his theories of the case in midstream. The Court at the beginning of each issue asked him what his constitutional theory was. Almost invariably he departed from that theory during the presentation of his case. Although the Court managed to limit him to his stated theory, his attempts to transform it and present additional causes of action wasted precious time. Mayberry also made numerous motions for mistrial. By the end of the first five days of trial, Mayberry had moved for mistrial at least 10 times. Also, Mayberry requested sidebar conferences incessantly. Most of these motions and the conferences were frivolous. To give an example of the amount of time that these motions and conferences wasted, during the last eight trial days of this case, Mayberry spent eleven hours and 51 minutes interrogating witnesses or making opening or closing statements and counsel for the Defendants spent twelve hours and 55 minutes in like activity. Since this Court would usually spend approximately 40 hours trying a case in eight days that means that over a third of the time was spent primarily ruling on Mayberry's motions and on sidebar conferences. These figures were compiled from time sheets that I maintained during this trial. Copies of these sheets are being placed in the record. After the cut-off Order of January 13, 1977 was issued, the Court permitted Mayberry to determine the sequence in which his claims would be presented to the jury by special verdict questions. This was done to allow Mayberry to try his most important causes of action in the event that all were not reached. Instead Mayberry spent two days litigating the seizure of the United States Air Force Survival Manual which cost $4.25 in preference to his allega-

tion that prison officials had attempted to kill him. His sequence of presentation enforces the Court's view that Mayberry's primary goal was not vindication of his constitutional rights.

Mayberry was given sixteen trial days to present the liability portion of his case after the day on which the jury was drawn. It is this Court's view that an attorney of average competence could have presented the evidence on liability heard by the Court in the 16 trial-day period in at least half that time. Since Mayberry is at least as capable as an average attorney, the Court can only conclude that it was his intention to delay deliberately the operation of this Court or that he proceeded with a reckless indifference to the functioning of this Court. 635 new cases are assigned every year to each judge in the Middle District of Pennsylvania. This District is understaffed and overworked. Although that may be true of Federal District Courts everywhere, it is especially true in this District. In order to insure that every litigant receives a reasonably speedy day in Court, it is imperative that parties to disputes have some concern regarding the time of the Court expended in the trial of a cause of action. The Court does not mean to imply that the press of cases and the time demands upon a trial judge override an inmate's or anyone else's right to a day in Court, but such considerations must be taken into account.

Assuming that the case would have progressed at the same rate that it did before the Court announced the deadline, it would have taken this Court nine weeks to dispose of Mayberry's claims. After the deadline was announced on January 13, 1977, Mayberry did speed up his presentation but still proceeded in such a manner that the Court is forced to conclude that he was not concerned with getting his causes of action to the jury. Even at the rate of progress after January 13, 1977, this Court would have had to spend at least four more weeks on this case if all of his issues were to be tried. Mayberry's remaining claims simply do not require such time. Mayberry's right to a day in Court is not at issue here, but whether he may proceed without any regard at all to the workload of this Court and to the rights of other litigants to try their disputes. Because this case took 17 days to try, 16 days for liability, one day for damages, the 10 cases on the January trial list had to be put over to February and the February trial list of 15 cases had to be postponed until May.

In balancing these countervailing interests, the Court concluded that sixteen days were more than enough time to present all of the claims at issue. A federal district court is not helpless in the face of a litigant who has no motivation or incentive for prompt disposal of his cause of action. Cruz v. Beto, 405 U.S. 319, 327, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), (Rehnquist, J., dissenting.) Mayberry obviously was not looking forward to spending time in the B.A.U. The Court is of the view that Mayberry considered his days in trial as a holiday or a junket. Every departure from the prison presents an opportunity for escape. In view of Mayberry's escape attempt when being transported to the State Correctional Institution at Graterford from the United States Courthouse in Philadelphia, the United States Marshals were concerned that he would try to escape during this case. Their anxiety was increased by the fact that the courthouse where the trial was held is a security officer's nightmare and a potential escapee's dream.

The unrestrained profligate inmate litigant is a relatively new problem for the judicial system. Consequently, there has been no clear-cut doctrine formulated to deal with this challenge to the ability of Courts to maintain control of their dockets. Requiring specific pleading and personal involvement in § 1983 claims has been the beginning of an attempt by Federal Courts to dispose of frivolous suits. But what is to be done when an inmate litigant states a constitutional cause of action, revels in his courtroom appearance, and has no desire to leave? The trial court must be able to impose reasonable time restraints.

In this case the Court examined the claims remaining to be tried, estimated what was a reasonable time for the presentation of Mayberry's case and then imposed it as a limit. This was not a penalty but an attempt to accommodate Mayberry's right to present his causes of action and the necessity that this Court function in an expeditious manner. This situation is not an isolated phenomenon. As inmate § 1983 suits continue, this problem will be met again and again. If the courts do not respond in a forceful manner, the Federal Courts will find themselves at the mercy of these inmates. As the Court said in *Morales v. Schmidt,* 340 F.Supp. 544, 547 (W.D. Wis.1972), the very fact that bringing suits in such numbers creates serious problems for correctional authorities and the courts is a matter of indifference and perhaps of even wry satisfaction to the inmate.

The functioning of this Court is not the only interest at issue. High level prison officials at the Dallas Institution were forced to sit in the courtroom for sixteen days for the liability portion of this case and one day for the damage issue. Mayberry sought a subpoena for the Pennsylvania Commissioner of Correction but that was denied by the Court. The functioning of Dallas institution was impaired. When an inmate presents a claim in an expeditious manner, this is simply the price that must be paid for the vindication of constitutional rights. But when an inmate such as Mayberry proceeds with no regard at all to time and in a deliberate attempt to drag the trial out as long as possible, then such damage must be considered in limiting the time he has within which to proceed. In addition, the Commonwealth of Pennsylvania incurred considerable costs in transporting Mayberry daily from Dallas to the United States Courthouse in Williamsport, a distance of approximately 60 miles. The Commonwealth also had to produce several inmates requested by Mayberry as witnesses. One of these inmates had to be brought from the State Correctional Institution at Pittsburgh. As many as five state guards were required daily during the trial to insure that neither Mayberry nor his inmate witnesses would escape. From two to six United States Marshals were present each day of the trial to protect the Court, its staff, and the jury, the number of marshals varying depending on how seriously they viewed the possibility for violence for each particular day. This heavy security was necessary because of Mayberry's past conduct, including an escape attempt when returning to Graterford from the United States Courthouse in Philadelphia. The jury in this case in addition to receiving a $20.00 a day fee, per person, also was entitled to transportation expenses. Since most members of the jury lived over 50 miles from the Courthouse, this cost was substantial. If Mayberry had proceeded to vindicate his claims diligently and in good faith, the enormous expense of security, transportation, witnesses, and the jury would have been a necessary burden for the protection of his constitutional rights. But such expenditures of the public's money cannot be justified when Mayberry's primary interest is to stay in Court as long as possible.

Although the Courts have not formulated a specific course of action with which to respond to this new challenge, the manner in which the courts and Congress have reacted to similar problems indicates that this Court has the authority to act in the way in which it did. Rule 41(b) of the Federal Rules of Civil Procedure enables the federal district court to dismiss a cause of action for lack of prosecution. The Supreme Court has held that even if there were no Rule 41(b), a District Court has an inherent right to dismiss a case for failure to prosecute diligently. *Link v. Wabash R. Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). 28 U.S.C. § 1915 states that a District Court can dismiss a case brought *in forma pauperis* if the Court concludes that it is frivolous. Rules 611 of the Federal Rules of Evidence states that "The Court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make

the interrogation and presentation effective for the ascertainment of truth, (2) to avoid needless consumption of time . . . ." In addition, Federal Courts have often dismissed cases brought by inmates who have escaped during the pendency of their claims. The rationale for this is that an escape disentitles the fugitive to call upon the resources of the Court for the determination of his claim. This doctrine has been applied to appeals from a criminal conviction. *Molinaro v. New Jersey,* 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970); *Shaw v. Estelle,* 542 F.2d 954 (5th Cir. 1976); *Broadway v. City of Montgomery,* 530 F.2d 657 (5th Cir. 1976). Several district courts in response to numerous filings of lawsuits by inmates have limited their right of access to the federal courts. *Green v. Wyrick,* 428 F.Supp. 732 (W.D.Mo.1976); *Hill v. Estelle,* 423 F.Supp. 690 (S.D.Tex.1976). Although the above-stated rules and doctrines do not expressly authorize the action that this Court has taken in limiting the amount of time available to Mayberry to present his claim, they provide a background supporting its action. In the light of the foregoing, Mayberry's remaining claims will be dismissed with prejudice.

## XI. Nominal Damages

The jury found Albert J. Perlis liable for delay in mailing Mayberry's briefs to the District Attorney and Deputy Court Administrator of Luzerne County and awarded nominal damages in the amount of $100.00. The jury found that Mayberry was not entitled to punitive or compensatory damages. The amount of the delay could not have exceeded two working days. Parenthetically, had this issue been tried to the Court without a jury, I would have awarded Plaintiff no damages whatsoever. I considered all of Mayberry's claims to be without merit. At the conclusion of the testimony on the damage issue, counsel for Perlis made a motion for a directed verdict. After the jury returned with its verdict for $100.00 in favor of Mayberry, counsel for Perlis made a motion that the verdict be reduced to $1.00. On February 1, 1977 Perlis filed a written motion for judgment notwithstanding the verdict, pursuant to F.R. Civ.P. 50(b) as to the damage issue, supported by a brief, in which he contends that the award of $100.00 should be reduced to $1.00. It is clear that the rule of law in the Third Circuit is that nominal damages may not exceed $1.00. *United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823, 830 (3d Cir. 1976). Rule 50(b) of the Federal Rules of Civil Procedure seems to require that before a judgment notwithstanding the verdict can be entered, the party must have made a motion for directed verdict at the close of all the evidence. Although Perlis made a timely motion for directed verdict, he, of course, did not make it for a verdict in the amount of $1.00. The Court concludes that in order to comply with the Third Circuit's directive in *United States ex rel. Tyrrell v. Speaker, supra,* the jury's verdict of January 24, 1977 for nominal damages in favor of Mayberry must be reduced to the sum of $1.00.

## 4. Conclusions of Law

1. The prohibition of visits to the Plaintiff by James and Priscilla Mayberry was in reasonable furtherance of the security of the prison.

2. The prohibition of visits to the Plaintiff by James and Priscilla Mayberry was no greater an intrusion than was necessary to further the security of the prison.

3. Prison officials do not discriminate against Mayberry with respect to his visitors.

4. The limitation on correspondence between the Plaintiff and James and Priscilla Mayberry was in reasonable furtherance of the security of the institution and was no greater than necessary to further that interest.

5. The limitation on correspondence between the Plaintiff and Martha Austria was in reasonable furtherance of the security of the institution and was no greater than necessary to further that interest.

6. The ban on the introduction of the Prisoners' Free Press into Pennsylvania prisons was of statewide application and was in no way discriminatory with respect to any of the rights of the Plaintiff.

7. The prohibition of correspondence from Mayberry to Attorney David Kairys at Post Office Box 4731, Philadelphia, Pennsylvania, the post office box of Imprisoned Citizens Union, was in reasonable furtherance of the security of the institution and was no greater an intrusion than necessary to further that interest.

8. The restriction on receipt by an inmate of publications which are not prepaid unless the name and serial number of the inmate and State Correctional Institution at Dallas, Pennsylvania appear in the address is reasonable, in furtherance of order in the institution and rehabilitation of inmates and is no greater intrusion than is necessary to further that interest.

9. The confiscation of the United States Air Force Survival Manual from Plaintiff's cell was in reasonable furtherance of the security of the institution and the prevention of escape and was no greater an intrusion than necessary to further these interests.

10. Plaintiff's solitary confinement since November, 1972 has been in reasonable furtherance of the security of the institution and the safety of other inmates and prison personnel and is not cruel and unusual punishment.

11. Plaintiff has not demonstrated that he should be released to the general population.

12. The Plaintiff in the sixteen trial days following the day on which the jury was drawn had ample time for the presentation of all of his evidence on all of his issues concerning the liability of the Defendants.

13. Plaintiff intentionally presented his case in a dilatory manner so as to delay the proceedings and repeatedly made objections which had no merit whatsoever, well knowing that the objections were without merit, and requested innumerable bench conferences to advance positions that he knew had no merit whatsoever.

An appropriate order will be entered.

## ORDER

1. The Defendant Jeffes, other prison officials and officers at the State Correctional Institution, Dallas, Pennsylvania, are enjoined and restrained from opening Plaintiff's outgoing or incoming legal mail except in Plaintiff's presence or under proper warrant.

2. Mayberry's other requests for injunctive relief will be denied.

3. The claims in Mayberry's complaint which were not presented to the jury and to the Court by the end of the trial day of January 21, 1977 are dismissed with prejudice.

4. The jury's verdict of nominal damages against Perlis in favor of Mayberry is reduced to $1.00.

5. The Clerk shall enter judgment against Perlis in Mayberry's favor in the amount of $1.00.

6. The Clerk shall enter judgment in favor of all Defendants except Perlis on the special verdicts.

7. The Clerk shall enter judgment in favor of Perlis except on special verdicts 36, 37, 39, 40, and 98.

8. The Clerk of Court shall enter judgment for the Defendants as to all of Mayberry's other claims for injunctive relief which were presented to the Court by the end of the trial day of January 21, 1977.